**William MURPHY, Plaintiff and Respondent,**

v.

**FARMERS EDUCATIONAL AND COOPERATIVE UNION OF AMERICA, NORTH DAKOTA DIVISION** commonly known as **North Dakota Farmers Union,** a corporation, Defendant and Appellant.

No. 7503.

Supreme Court of North Dakota.

Oct. 27, 1955.

638

Quentin Burdick, Fargo, for defendant and appellant.

Hjellum, Weiss & Nerison, Jamestown, for plaintiff and respondent.

SATHRE, Judge.

This is an action for libel. The defendant made a motion to strike part of the complaint. Upon denial of the motion to strike, defendant interposed a demurrer to each of the four causes of action alleged in the complaint. The demurrers were overruled and defendant was given thirty days within which to answer. Defendant answered by general denial, and further alleged that the complaint did not state facts sufficient to state a cause of action; that the alleged defamatory words set forth in the complaint are true, and that the defamatory words complained of constitute fair comment of a public official. The case was tried to the court and a jury. The jury returned a verdict for the plaintiff. Judgment was entered accordingly and the defendant appealed from the judgment and the whole thereof.

The complaint, the sufficiency of which is attacked is as follows:

Plaintiff for his cause of action against the defendant alleges:

**"1.**

"That the Defendant is now and has been at all times mentioned in this Complaint a domestic corporation.

**"2.**

"That the North Dakota Union Farmer, a newspaper published semi-monthly in the City of Jamestown, North Dakota, with additional entry at Frederic, Wisconsin, is and at all times mentioned in this Complaint has been the official organ of the Defendant; that said newspaper enjoys a wide circulation among the citizenry of North Dakota, principally among farmers.

**"3.**

"That on June 16, 1952, the Defendant, through its official organ, the North Dakota Union Farmer, did knowingly, intentionally, wilfully and maliciously print, publish and cause to be circulated among its subscribers, purchasers and others in a regular issue of said paper of that date, the following statements, to-wit:

"(a) In a heavily outlined rectangle on page one:

" 'Inside Stuff

" 'What's the "inside" of the dairy industry of North Dakota. This being Dairy Month, you'll probably be interested in reading about it on Page 6, this issue.'

"(b) On page six, under a headline, 'June "Dairy Month" Points Up Problems Of ND's Dairy Industry':

" 'Victims of "Centralizers"

" 'North Dakota is known as a 'butterfat' state. Only a small portion of the total milk production in the state is sold as "whole milk". This is true for a number of reasons: sparse herds, seasonal milk production, long distances, bad winters which hamper delivery.

" 'A great percentage of the milk is separated on the farms. At infrequent intervals the cream is delivered at "centralizer" way stations—it stands in unsanitary places—is handled by people who handle the cream as "an accommodation"—and often the cream sits at a railroad station in the hot sun or freezes in cold weather. The total result is that the state has a reputation for "poor" butter.

" 'By the very nature of their operations, "centralizers" are not interested in 'quality' butter. Quality butter can be made only from fresh sweet cream —and because of the time-lag set-up of the centralizers—from farm, to cream station to processing plant—sweet cream is an impossibility and poor butter is the result.'

"(In bold face type)
" 'But the big centralizers like Fairmont, Armour, Swift, Cudahy, and Mandan (in North Dakota) control the pricing of butter and since almost all of their butter is of poor quality, they have a stake in poor quality production and they favor and maintain a pricing system of butter which protects poor quality.'

" 'But this pricing system does not work to the advantage of the North Dakota dairy farmer. He takes a low score on his butterfat but the centralizers take a big price for the finished "poor" butter. Proof of this can be found on the market places. There is only a cent or fraction difference between high score butter and low score butter. But the farmers takes a very low price for low-score cream.

" 'There is little incentive for farmers to produce better quality as there is in the case of premium wheat, premium durum, barley, etc.

### " 'Dairy Organization

" 'The big centralizers also dominate the American Butter Institute and the American Dairy Association. Ostensibly these organizations are established to encourage the dairy industry —make it more profitable for the farmers—increase use of dairy products,' etc., etc.

"(In bold face type)
" 'But the big centralizers levy a heavy check-off from the farmer for each pound of milk or butterfat that is marketed and then, in effect, use the funds to 'sell' consumers second grade dairy products.

"(In bold face type)
" 'At the same time the big centralizers like Swift, Armour, Cudahy and others are using the farmers' money to help pay advertising costs, these same big companies are spending millions of dollars to promote the increased use of butter substitutes—principally oleomargarine.

### " 'Dairy Commissioner

" 'Furthermore, in North Dakota you have a state official, the State Dairy Commissioner, Bill Murphy, spending most of his time acting as the errand boy for the ADA—personally supervising the cream check deductions every spring and enjoying ADA expense accounts that nearly equal his state pay. This is wrong. Particularly when ADA is completely dominated by the big centralizers.

" 'The Dairy Commissioner has, as one of his principal duties, the job of enforcement. It is a strange sight then to see an enforcement officer soliciting funds—it's like having a police chief soliciting funds for advertising in a police handbook from the tavern operators. And farmers are given no general accounting of how the funds are used.

"(In bold face type)
" 'Anyone reading the Dairy Record (the industry's magazine) could find out that the dairy enforcement division in Minnesota reports a number of arrests each week. No such arrests have

ever been reported in this state. Apparently the dairy commissioner is more concerned with collecting funds for the centralizers' ADA than he is with performing his job as enforcement officer and supervisor of the industry in the farmers' behalf.

" 'A few year ago, a number of bills were introduced in the state legislature that would correct some of the problems of milk distribution in the state. Something that the Dairy Commissioner and the State Department of Agriculture should have supported vigorously. Instead, they led the fight against the bills.

" 'Dairying Has a Place

" 'With all the thousands upon thousands of dollars which farmers of this state have kicked into the ADA and with the thousands upon thousands which taxpayers have paid to maintain the Dairy commissioners department, no real effort has been made to promote the dairy industry in this state.

" 'The only good work—and it has been considerable considering the funds allotted to it—has been accomplished by the small group of earnest scientists and trained men at the NDAC'.

"4.

"That the statements which refer to Bill Murphy and to the Dairy Commissioner are directed at the Plaintiff William Murphy and were deliberately designed to, and did convey to the readers of the North Dakota Union Farmer the fact that the person to whom said statements referred was the Plaintiff, and said statements are false and defamatory.

"5.

"That at all times the Plaintiff has been a man of ability, integrity, honesty and industry and has at all times since becoming Dairy Commissioner of the State of North Dakota diligently, honestly, conscientiously and industriously pursued the duties of said office to the best of his ability.

"6.

"That the aforesaid statement:

" 'Furthermore, in North Dakota you have a state official, the State Dairy Commissioner, Bill Murphy, spending most of his time acting as the errand boy for the ADA—personally supervising the cream check deductions every spring and enjoying ADA expense accounts that nearly equal his state pay.'

was deliberately designed to, and did convey the impression and statement that the Plaintiff was morally dishonest, derelict in his duty, impotent in his work, and said statement was libelous per se.

"7.

"That the aforesaid statement:

" 'The Dairy Commissioner has, as one of his principal duties, the job of enforcement. It is a strange sight then to see an enforcement officer soliciting funds,—it's like having a police chief soliciting funds for advertising in a police handbook from the tavern operators.'

was deliberately designed to, and did convey the impression and statement that the Plaintiff was morally dishonest, derelict in his duty, and guilty of misfeasance in the performance of his work and said statement was libelous per se.

"8.

"That the aforesaid statement:

" 'Apparently the Dairy Commissioner is more concerned with collecting funds for the centralizers' ADA than he is with performing his job as enforcement officer and supervisor of the industry in the farmers' behalf.'

was deliberately designed to, and did convey the impression and statement that the Plaintiff was morally dis-

honest, derelict in his duty and guilty of misfeasance and nonfeasance in the performance of his work and said statement was libelous per se.

"9.

"That the aforesaid statement:

" 'With all the thousands upon thousands upon thousands of dollars which farmers of this state have kicked into the ADA and with the thousands upon thousands which taxpayers have paid to maintain the Dairy Commissioner's department, no real effort has been made to promote the dairy industry in this state.'

was deliberately designed to, and did convey the impression and statement that the Plaintiff was morally dishonest, derelict in his duty and guilty of nonfeasance in the performance of his work and said statement was libelous per se.

"10.

"That the complained of statements quoted in paragraphs 6, 7, 8 and 9 above and referring to this Plaintiff were false and defamatory; that on May 21st, 1953, this Plaintiff caused to be served upon Defendant a Notice in accordance with section 14–0208 of the North Dakota Revised Code of 1943, wherein said Defendant was notified that Plaintiff was aggrieved by said publication of the quoted statements set forth in paragraphs 6, 7, 8 and 9 above because of their false and defamatory nature; and that if a full and fair retraction of said erroneous statements were not published in the next issue of the *North Dakota Union Farmer* in as conspicuous a place and type as the original article, said Plaintiff would bring suit for libel because of said publication; that in spite of the service of said Notice upon Defendant, said Defendant has failed, neglected and refused to make a full and fair retraction of said quoted statements either in the next issue of the *North Dakota Union Farmer* or in any subse-

quent issue of the *North Dakota Union Farmer* in as conspicuous a place and type as the original article.

"11.

"That because of the printing, publishing and circulation of the complained of and quoted statements in paragraphs 6, 7, 8 and 9 above this Plaintiff has been exposed to hatred, contempt, ridicule and obloquy and has been shunned and avoided and said quoted statements have had a tendency to injure this Plaintiff in his occupation, all to this Plaintiff's damage in the sum of $10,000.00.

"Wherefore, Plaintiff prays for judgment against the Defendant for said sum of $10,000.00 as actual damages and for the further sum of $5,000.00 as exemplary damages and for his costs and disbursements herein."

Before bringing this action and in accordance with Section 14–0208 NDRC 1943, the plaintiff served upon the defendant a notice and demand for retraction of the alleged libelous article as it appeared in the issue of the defendant's paper on June 16, 1952. The notice contained an exact copy of the language as used in the published article and made a demand that unless a full and complete retraction was made an action for damages would be brought against the defendant. This notice was served on the defendant on the 21st day of May 1953, and was admitted in evidence as plaintiff's exhibit No. 4.

After the service of the complaint the defendant served notice of motion upon the plaintiff to strike paragraph three of the complaint upon the ground that it was irrelevant and redundant and that the defendant was aggrieved by the insertion thereof in the complaint. After hearing thereon the motion was denied by the trial court. Defendant then demurred to each of paragraphs 6, 7, 8 and 9 of the complaint on the ground that they did not state facts sufficient to constitute a cause of action. The demurrers were overruled. The defendant then answered admitting its cor-

porate existence, denying generally the allegations of the complaint, alleging that it did not state facts sufficient to constitute a cause of action, that the statements in the article complained of were true, and were fair comment of a public official, and denied that the publication of said article was malicious. The answer further alleged that defendant made a correction and retraction of the alleged defamatory matter in said article according to its best knowledge and information.

At the opening of the trial and when the first witness was called and sworn on behalf of the plaintiff the defendant objected to any testimony and the introduction of any evidence upon the grounds and for the reason that the complaint in the action did not state facts sufficient to constitute a cause of action. The objection was overruled.

The plaintiff is the dairy commissioner of the State of North Dakota and had held that position for more than 17 years. The dairy department is a division of the state department of agriculture and labor, and the dairy commissioner is appointed by the commissioner of agriculture and labor and his duties are prescribed by Section 4-1701 NDRC 1943.

"The dairy department is a division of the department of agriculture and labor, and shall promote, improve, and regulate the dairy products of this state and enforce proper rules and regulations pertaining thereto."

There is no material dispute as to the facts in the case.

The first witness for the plaintiff was Robert F. Dugan. He testified that he was the editor of the North Dakota Union Farmer and that he was editor of said paper on June 16, 1952. He admitted that the article complained of by the plaintiff as alleged in the complaint was published on the 16th day of June 1952. The article was admitted in evidence as plaintiff's exhibit 2.

The plaintiff testified in substance as follows:

The term ADA as used in the pleadings and in the record refers to an organization known as the American Dairy Association. This organization consists of units from a number of States in the Union. The organization is established to promote the dairy industry, advertise merchandise and the sale of dairy products. The membership of the ADA is composed of dairy farmers who contribute funds of their own to do the particular work of the organization. The board of directors of the State Association is composed of 10 dairy farmers and 10 creamery operators. As Dairy Commissioner he has assisted the American Dairy Association to some extent. He considered that as part of his duties because it is the purpose of this association to promote increased sales and consumption of dairy products.

During the month of June or July the month known as the Dairy Month, the dairy farmers voluntarily contribute 1¢ per lb. of the cream sold to create a fund for defraying the expenses of the state ADA. This contribution is not required but is voluntary on the part of the dairy farmers. The proceeds of these collections are sent to the Dairy Commissioner who keeps a record of the amounts and creamery stations from which they are sent. The checks are then forwarded to the treasurer of the State ADA.

The plaintiff as Dairy Commissioner attends approximately six meetings annually within the state of the State ADA. The traveling expenses to and from these meetings are paid out of the expense fund collected from the dairy farmers to which reference has been made. The Commissioner also attends approximately six meetings annually of the National ADA and these meetings are held in different cities within the United States. The traveling expenses to and from these meetings are paid by the National ADA.

Under the provisions of the by-laws of the State ADA the Dairy Commissioner is ex-officio member of the board of directors. He has a voice at the meetings but does not have a vote. The plaintiff as Dairy

Commissioner never made any charges or collected compensation for his personal services to the State ADA or to the National ADA. The only charges that have been made are for actual expenses and cash expended in his office for clerk hire and other help in the matter of keeping the records of the State ADA.

He testified further that the total amount of expenses for clerk-hire and other items incurred for the State ADA as of March 31, for the years 1950, 1951, 1952 and 1953 are as follows:

1950....$717.77   1952....$1086.95 and for
1951....$954.24   1953....$ 686.09

These figures were taken from the annual audit of the ADA for said years. The audits were introduced in evidence as plaintiff's exhibits 5, 6, 7 and 8. He stated further that he had nothing to do with the solicitation of funds for the State ADA and never did solicit funds for the ADA.

As part of his duties he or members of his staff supervised the creameries of the state as to sanitation, efficiency and proper methods of operation, and since 1950 he assigned one member of his staff to give his full time to work with the creameries, assisting them in securing more efficient operation, better care of the products of the plants, and better sanitary conditions. His department made several thousand laboratory analyses of milk and cream from biennium to biennium, and that these analyses were made for the purpose of testing and improving the quality of these products.

With reference to enforcement by the dairy department of the laws, rules and regulations covering the dairy industry he stated that several hundred hearings had been had and many prosecutions had been conducted for faulty readings of the Babcock Test, undertesting, giving the farmer less than he was entitled to and not grading his cream properly.

Plaintiff further testified that seventy-five percent of the dairy farmers of the state belong to the State ADA.

Several other witnesses testified for the plaintiff as to plaintiff's efficiency in the discharge of his duties as Dairy Commissioner. John Eagleson from Buchanan, North Dakota testified that he had been a farmer in the state since 1914 and that he is now a dairy farmer. He was a director of the ADA and had been its president, and a member thereof for 10 years. He stated that he was well acquainted with the Dairy Commissioner; that from his own knowledge as director of the ADA he knew that plaintiff did not solicit or collect funds for the ADA, nor did plaintiff supervise check deductions from dairy farmers for the ADA. He stated also that the plaintiff did not enjoy expense accounts for personal services for the ADA.

A. M. Femrite testified that he was manager of the creamery division of Mandan Creamery & Produce Co., and had been engaged in the creamery business 25 to 26 years; he was a member of the board of directors of the ADA. He stated that the deductions from the dairy farmers' cream checks of one cent per pound during the dairy month was done at the creamery where the cream was delivered and that the plaintiff did not supervise the cream check deductions. He testified further that during plaintiff's administration as Dairy Commissioner the general quality of cream in the state had been raised twenty-five percent. He stated that to his knowledge plaintiff had diligently enforced the dairy laws of the State of North Dakota.

Ray Bryngelson, manager of the Barnes County Coop. Creamery at Valley City stated he had been in the creamery business 23 years and that he had known the plaintiff for many years. His testimony was to the same effect as the testimony of the witnesses John Eagleson and A. M. Femrite. He stated in substance that the plaintiff as dairy commissioner brought about a general quality improvement in dairy products and that he diligently enforced the dairy laws of the state.

Other witnesses for the plaintiff were Ben Haines, a creamery operator from

Wishek, North Dakota, Otto Spies, a creamery operator from Mayville, North Dakota, Vernon Cooper, a dairy farmer from near New Rockford, North Dakota, all of whose testimony was of like nature as the testimony of Bryngelson and Femrite, and it is not necessary to rehearse it here, except to state that they agreed that the plaintiff did good work as dairy commissioner.

O. A. Amundson testifying for the plaintiff stated that he was manager for the Jamestown creamery of Bridgeman-Russell Company and was also treasurer of the State ADA. He had been in the creamery business since 1915. He stated that Bridgeman-Russell had three creameries in North Dakota and 125 local stations where they purchased cream. With reference to the deductions of 1¢ per pound for cream purchased during the dairy month he stated that they were all made at the local stations and that the plaintiff as dairy commissioner made no solicitations and collected no funds; that the local stations and creameries forwarded the funds to the dairy commissioner who made a record of them and then sent the checks to the ADA treasurer. He testified at great length as to the dairy and creamery industries in North Dakota and stated that the quality of dairy products improved during the administration of the plaintiff as dairy commissioner and that he was an outstanding public official.

Math Dahl, Commissioner of Agriculture and Labor testified that the plaintiff was his appointee and was an employee of his department whom he approved.

Robert F. Dugan, editor of defendant's paper the Union Farmer, testifying for the defendant stated that after demand by the plaintiff and on June 15, 1953 he published a correction or retraction of the article of June 16, 1952. That the retraction was published on page 6 of the issue of the Union Farmer of June 16, 1953. The correction was admitted in evidence as defendant's exhibit B, and is as follows:

"Correction

"The June 16, 1952 issue of the North Dakota Union Farmer Stated:

" 'Furthermore, in North Dakota, you have a state official, the State Dairy Commissioner, Bill Murphy, spending most of his time acting as the errand boy for the ADA personally supervising the cream check deductions every spring and enjoying ADA expense accounts that nearly equal his state pay * * *' Since the statement was printed, Mr. Murphy advised the North Dakota Union Farmer that he does not spend most of his time on ADA business, but that he devotes his evenings, nights and holidays to ADA business; accordingly, the statement is hereby corrected and retracted.

"Since the statement was printed, Mr. Murphy advised the North Dakota Union Farmer, that he does not enjoy ADA expense accounts that nearly equal his state pay; accordingly, the statement is hereby corrected and retracted."

Defendant's exhibits D and C were admitted in evidence. Defendant's exhibit D is a letter from Dugan the editor of the North Dakota Union Farmer to the plaintiff dated May 4, 1953. Exhibit C is plaintiff's reply to exhibit D. These exhibits will be referred to later in this opinion.

At the close of all of the testimony when both parties had rested the defendant made a motion for a directed verdict upon the grounds and for the reason that the plaintiff had failed to sustain the allegations of the complaint. The motion was denied whereupon the defendants made a motion for a dismissal of the action upon the same grounds which motion was also denied. The case was submitted to the jury and the jury returned a verdict awarding damages to the plaintiff. Thereafter the defendant made a motion for judgment notwithstanding the verdict or in the alternative for a new trial upon the ground of errors of law occurring at the trial and the insufficiency

of the evidence. The motion was denied and the defendant appealed. The defendant assigned numerous errors which were argued in its brief under the following heads:

"1. error in refusing to strike pleadings and admission of redundant matters.

"2. error in overruling demurrers.

"3. insufficiency of the evidence.

"4. errors in reception of evidence.

"5. errors in instructing the jury."

We shall consider these specifications in the order stated.

■ Before interposing answer the defendant made a motion to strike paragraph 3 of the plaintiff's complaint. The motion was based on the contention that said paragraph 3 was repetitious, redundant and prejudicial to the defendant. The first part of the publication that the defendant sought to have stricken appeared on the first page of the issue in which the article was published. It reads as follows:

" 'Inside Stuff' What's the inside of the dairy industry of North Dakota, this being dairy month you will probably be interested in reading about it on page 6 of this issue."

On page 6 of the issue appears that portion of the article quoted in paragraph 3 of the plaintiff's complaint which the defendant moved to strike. This portion of the article is an unfavorable report of the condition of the dairy industry in the State of North Dakota. It refers to the big centralizers like Swift, Armour, Cudahy and others using millions of dollars of the farmers' money to advertise increased use of butter substitutes to the detriment of the farmers. This part of the publication is in the nature of an introduction to and lays the foundation for the charges made in the remainder of the article and is an integral part thereof.

"In determining whether or not the newspaper publication is libelous, the words used in the article must be construed as a whole. All the words contained in the article should be given their ordinary meaning as read and construed by people of ordinary intelligence, and the publisher's intent and the effect of the publication must be gathered from the words and the circumstances under which they were uttered." * * * 53 C.J.S., Libel and Slander, § 121, p. 198.

" 'In determining the actionable quality of words claimed to be libelous, the entire writing, including the title or headlines, must be considered, 18 Am. & Eng.Ency.L. 985; 25 Cyc. 357. And particular words or phrases must be construed in connection with remainder of the article of which they form a part.' McCue v. Equity Co-Op. Pub. Co., 39 N.D. 190, 167 N.W. 225, 229." Ellsworth v. Martindale-Hubbel Law Directory, 69 N.D. 610, 289 N. W. 101, 105.

■■ We conclude therefore that it was not error on the part of the trial court to refuse to grant the defendant's motion to strike the portion of the article complained of by the defendant.

The defendant demurred separately to each of paragraphs 6, 7, 8 and 9 of plaintiff's complaint upon the ground that they did not state facts sufficient to constitute a cause of action against the defendant. That portion of the alleged defamatory publication contained in paragraph 6 states that the dairy commissioner, the plaintiff, is "spending most of his time acting as the errand boy for the ADA,—personally supervising the cream check deductions every spring and enjoying ADA expense accounts that nearly equals his pay."

Clearly, the language quoted charges the plaintiff with failure to perform the duties of his office and that he spends most of his time in other activities not connected with his office for which he collected compensation nearly equal to his salary as dairy commissioner.

Paragraphs 7 and 8 of the complaint may be considered together. The portion of the

article quoted in paragraph 7 states that the dairy commissioner has as one of his principal duties, the job of enforcement and then continues "it is a strange sight then to see an enforcement officer soliciting funds—it's like having a police chief soliciting funds for advertising in the police hand-book from tavern operators." The "strange sight" and the comparison of the plaintiff as an enforcement officer with a "police chief soliciting funds for advertising in a police hand-book from tavern operators" would undoubtedly leave an impression in the minds of readers of the publication that plaintiff was guilty of reprehensible conduct and would probably subject him to their hatred and contempt. The introductory paragraph of the publication describes the "big centralizers" as engaged in a concerted practice to take advantage of the dairy farmers in the state and that the ADA is controlled by the centralizers. Then follows the charge quoted in paragraph 8 of the complaint that the plaintiff is more concerned with collecting funds from the dairy farmers for the benefit of the centralizers' ADA than in doing his job as enforcement officer and supervisor of the industry in the farmers' behalf. The language quoted purports to state facts, which if true, would establish that the plaintiff, as dairy commissioner, had failed to enforce the dairy laws of the state.

■ It is well settled that a demurrer admits the truth of all issuable relevant facts that are well pleaded.

. In the case of Roethke v. North Dakota Taxpayers Association, 72 N.D. 658, 10 N.W.2d 738, 740, this court said:

"The demurrer deals with the substance rather than the form. McCurdy v. Hughes, 61 N.D. 235, 237 N.W. 748. Even where a cause of action contains statements of different items and the sufficiency of some of these is disputed, as not stating a cause of action, the demurrer cannot be sustained, for 'unless all are bad the demurrer should be overruled.' King v. Stark County, 67 N.D. 260, 263, 271 N.W. 771, 773. With respect to the alleged allegation

of facts set forth in the complaint it is commonplace that the demurrer admits the truth of all issuable relevant material facts that are pleaded, including the falsity, publication and the malice alleged, in an action for libel. Englund v. Townley, 43 N.D. 118, 174 N.W. 755. See, also, Federal Land Bank [of St. Paul] v. Koslofsky, 67 N.D. 322, 327, 271 N.W. 907, 908."

■ We are of the opinion that the statements in the published article quoted in paragraphs 6, 7, 8 and 9 of the complaint, if true are derogatory of the plaintiff. They charge him with breach of official duty and therefore state a cause of action. The demurrers were therefore properly overruled.

The defendant next argues that the evidence is insufficient to support an action for libel per se. 53 C.J.S., Libel and Slander, § 121, p. 199, defines libel per se as follows:

"In order to be libelous per se it is not essential that the words should involve an imputation of crime, or otherwise impute the violation of some law, or moral turpitude, or immoral conduct, and newspaper articles generally may be libelous and actionable per se if they tend to expose plaintiff to public hatred, contempt, ridicule, aversion, or disgrace, and to induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse and society. Publications charging dishonesty or fraud, drunkenness, falsehood, unchastity, or which tend to injure a person in his occupation, trade, business, or profession, have been held libelous per se."

■ To the same effect is the following statement from 33 Am.Jur., Libel and Slander, Sec. 79, page 92:

"It is libelous per se to impute to a person in his character as a public officer incapacity or any kind of fraud, dishonesty, misconduct, or a want of integrity, or to charge that he has been induced to act in his official capacity by

a pecuniary or other improper consideration. The libel of a public officer, affecting him personally, is governed by the same rules that apply to an individual; but libel affecting him in his official character, and of such nature that, if true, it would be cause for his removal from office, is actionable per se. Even spoken words which impute unfitness or incapacity as regards an office of profit are actionable."

Publications which tend to injure a person in his occupation, trade, business or profession, have been held libelous per se.

■ The complaint alleges that the statements in the publication charging plaintiff with failure to discharge his official duties are false. The plaintiff and his witnesses testified to facts and circumstances establishing that he had discharged the duties of his office. The defendant's answer alleges that the statements in the published article are true and that they are fair comment of a public official. However, defendant has adduced no evidence that the published statements are true, and therefore the testimony of the plaintiff and his witnesses is uncontradicted. Published statements purporting to be facts, citing specific instances of failure to perform official duties cannot be said to be fair comment of a public official when such statements are not based upon any factual foundation. Defendant's exihibit D, its letter to the plaintiff of May 4, 1953, is in effect an admission that the publication was made without knowledge of its correctness. It requests the plaintiff to furnish information with respect to the statements contained in the published article-information which the defendant should have obtained before the article was published. We quote from the exhibit:

"You stated that the audit of the ADA in North Dakota revealed that an amount between $1000.00 and $1500.-00 was expended under your direction for clerical help, etc. Since when we publish the correction, we wish to be absolutely correct, we would like to have the exact amount for the story. Would you also send us a statement of all funds advanced and expended under your direction or for you, which you received from the national ADA? This should include all expense incurred in out-of-state travel, which was not paid by the State of North Dakota, and was paid by the state and/or national ADA, and any and all expense which may have been paid to you and through you by the national and state ADA."

■ The general rule is that the doctrine of fair comment does not permit newspapers to make derogatory statements concerning a public official unless such statements are based on facts or the occasion is privileged.

"Generally, however, comment or criticism of the acts of a public officer must be based or founded on truth. So it has generally been held that the right to comment or criticize does not embrace the right to make false defamatory statements of fact imputing a criminal offense or moral delinquency, or otherwise aspersive of the character of plaintiff, although made in good faith, and although the charge relates to the act of an officer in the discharge of his official duties." 53 C.J.S., Libel and Slander, § 134, pp. 218, 219.

In the case of Rogers v. Courier Post Co., 2 N.J. 393, 66 A.2d 869, 873, the Supreme Court of New Jersey held that:

"While matters of public interest and concern, such as the public acts of a public man, if truly stated, are legitimate subjects of criticism, and every one has the right to comment thereon so long as he does so fairly and without malice, nevertheless, the rule is well settled in this state, and in the great majority of jurisdictions elsewhere, that the defense of fair comment and criticism must be founded on true facts. What is thus privileged, if we may use that term, is the comment and criticism, and not the statement of alleged facts on which they

are based, and if one states facts otherwise libelous, he will not be privileged under the plea of fair comment if they are not true. Such a plea does not extend to the making of false statements, and it is no defense that they were mistakenly or honestly made, although such matters may be considered in mitigation of damages. News papers have no greater rights or privileges in this respect than ordinary citizens.

"Generally speaking, comment or criticism must be founded on truth. While ordinarily it does not consist of the assertion of facts, an allegation of fact may be justified by its being an inference from other facts truly stated, as discussed supra § 131. The right to comment or criticise does not extend to, or justify, allegations of fact of a defamatory character. If the publication is not a comment or criticism, but a statement of fact, the rules to be applied to the nature of recovery are those applicable to any other case of defamation, if defamatory and false, it is actionable, although made in good faith, without malice, and under the honest belief that it is true. Probable cause for making it is not a factor to be considered in determining whether or not it is privileged. Where the accusation is defamatory, the damage does not result from criticism based on the facts but from the false accusation that the facts exist for which the criticism is made." 53 C.J.S., Libel and Slander, § 132, pp. 215, 216.

Section 14–0203 NDRC 1943 defines Civil Libel as follows:

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

Appellant argues that since no special damages are alleged or proved in the case, if the plaintiff is to prevail at all, it must be on the theory that he has pleaded and proved the alleged matter to be actionable per se, yet, after each paragraph alleging defamatory matters, innuendo is pleaded.

The general rule is that a defamatory publication is libelous per se when, without aid of innuendo, it must be presumed to expose the plaintiff to hatred, contempt, ridicule, or obloquy, or to cause him to be shunned, or to have a tendency to injure him in his occupation. Ellsworth v. Martindale-Hubbell Law Directory, 66 N.D. 578, 268 N.W. 400. If the publication is libelous per se, no innuendo is necessary. The question in the instant case is therefore whether the language in the published article is in fact libelous per se.

We have referred to the published article set out in the complaint. In paragraph 6 of the complaint the quoted portion of the publication charges the plaintiff with being engaged in activities not connected with the duties of his office and for which he enjoys expense accounts nearly equal to his state salary. No innuendo is necessary to explain the meaning of the language to readers of the publication.

The language quoted in paragraph 7 of the complaint is an odious comparison of the plaintiff with "a police chief soliciting funds for advertising in a police handbook from the tavern operators." The language quoted in paragraph 8 charges the plaintiff with failure to enforce the dairy laws of the state, and paragraph 9 charges that the taxpayers of the state have received no benefit for the thousands upon thousands they have paid to maintain the dairy commissioner's department because no effort has been made to promote the dairy industry in the state. No innuendo or explanation is necessary to point out that the plaintiff as dairy commissioner is responsible for the lack of effort to promote the dairy industry of the state. The complaint alleges that all of the charges made in the published article are libelous per se. Where the publication complained of is libelous per se, innuendo if pleaded, is harmless and may be treated as surplusage.

"On the other hand, the innuendo may be treated as surplusage where it is used in connection with words which are unequivocal and actionable per se. In such case plaintiff is not confined to the meaning ascribed in the innuendo, and if sufficient remains to show that the article is libelous per se the action may be maintained. So it is generally held that, where plaintiff in an action has, by innuendo, put a meaning on the alleged defamatory publication which is not supported by its language or by proof, the court may nevertheless sustain the pleading and submit the case to the jury, if the publication is defamatory per se." 53 C.J.S., Libel and Slander, § 162, p. 253.

The trial court held as a matter of law that the publication was libelous per se and submitted the issues to the jury. We think the language of the published article is of such character as to warrant the trial court's conclusion that it was libelous per se and therefore it was not error to submit the issues to the jury.

The next contention of the defendant is that the trial court erred in the reception of evidence. Many alleged errors are cited but they are not argued to any extent in defendant's brief.

█ The plaintiff in one instance had testified without objection that the object of the ADA was to improve and promote the greater use of dairy products. He was then asked by his attorney: "I will ask you this: if, from your experience with ADA and as dairy commissioner, it has accomplished and does accomplish those purposes?" Over objection that it was calling for a conclusion plaintiff was permitted to answer: "It has accomplished its purpose." If the answer was a conclusion of the witness, it had but little, if any, bearing on the issue as to whether the published article was libelous, and therefore was harmless error. Other alleged errors in the reception of evidence were assigned in the specifications, but they were not argued except in a general statement to the effect that several witnesses were permitted to testify under paragraph 3 of the complaint which it is alleged the trial court erroneously refused to strike. Since we have held that the refusal of the trial court to strike paragraph 3 of the complaint was not error it is not necessary to consider it further here.

█ Defendant concedes in its brief that since there was no denial of the matter claimed to have been published there were but two questions for the jury to decide: was the matter true, and if not, how much damage should be given.

Defendant argues however that the court erred in instructing the jury as follows:

"The term nonfeasance has been used in the pleadings. Nonfeasance means neglect to do what should have been done. You are also instructed that in regard to the duties of public officials, the laws of the State of North Dakota provide as follows:

" 'Any public officer and any person holding any public trust or employment who wilfully neglects or refuses to perform the duties of his office as prescribed by law is guilty of a misdemeanor.' "

█ The published article charged the plaintiff with neglect and failure to perform his official duties. If the charges thus made were true the plaintiff would be guilty of nonfeasance in office. The truth or falsity of the charges of nonfeasance was therefore a question of fact for determination by the jury. The instructions of the trial court on the question of nonfeasance were therefore correct. The jury returned a verdict in favor of the plaintiff. After due consideration we are of the opinion that the evidence is sufficient to support the verdict.

Finding no reversible error in the record the judgment is affirmed.

BURKE, C. J., and MORRIS, GRIMSON and JOHNSON, JJ., concur.