VÍCTOR M. BOSCH, Plaintiff and Appellant, *v*. EDITORIAL EL IMPARCIAL, INC. ET AL., Defendants and Appellees.

No. 236. Decided February 12, 1963.

*Víctor M. Bosch* on his own behalf.    *Juan B. Soto, Juan F. Soto,* and *Carmelo Cintrón Ayuso* for appellees.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Mr. Víctor M. Bosch, attorney at law and appellant herein, filed an action for damages for libel against Editorial El Imparcial, Inc. and Antonio Ayuso Valdivieso, appellees herein, alleging that (1) appellant was First Vice President of the Labor Federation of Puerto Rico (State Branch of AFL-CIO), Vice Chairman of the Executive Committee of the District of Puerto Rico of the International Brotherhood of Pier Stevedores and Subsidiary Branches of Puerto Rico and of the Brotherhood of Graphic Arts Workers and Subsidiary Branches of El Imparcial (AFL-CIO), and trustee of the Board of Trustees of the Welfare Fund (PRSSA-UTM) of port laborers; (2) that on or about October 9, 1956 the last-mentioned Brotherhood was organized and certified as the proper contracting unit; (3) that collective bargaining was initiated between that Union and respondent enterprise which culminated in a picket strike in front of the building which houses the shops and offices of that enterprise; (4) that appellees published certain information and photographs in El Imparcial which are the basis of the 16 causes of action alleged in the complaint, which are summed up as follows:

The first cause of action is based on reports attached to the complaint, marked A(1), A(2), A(3), A(4), A(5) and A(6), which were published in El Imparcial on February 13, 14, 18, 19 and 23 and March 2, 1957. Exhibit A(1) refers to an assault committed on the person of a chauffeur of El Imparcial by an individual named Jesús Castro Molina who is designated as a member of the "Panic Squad, a terrorist gang headed by Pérez Roa, which proposes to spread the panic among the loyal employees of El Imparcial." Exhibit A(2) again makes reference to the same matter, to Pérez Roa as head of the terrorist gang designated as "Panic Squad," his picture being also published under the caption "Gang Leader." Exhibit A(3) also refers to the "Panic

Squad, a terrorist group which operates in open defiance of the authorities." Exhibit A(4) informs, "Another assault as part of a wave of violence and abuses which the so-called 'Panic Squad' has launched against friends and employees of EL IMPARCIAL who have not supported the illegal strike called by a group of shop workers ..." Exhibit A(5) informs that a group of pier workers of Ponce who are members of UTM-AFL-CIO "fired at the top leaders of that Union, Juan Pérez Roa, Víctor Bosch and Pedro Rosa, making serious imputations and holding them responsible for the maladministration of the Union which has brought about the rebirth of the 'rackets' ... All of them accused Pérez Roa and Víctor Bosch of promoting a series of combinations and manipulations which have favored the employers and which, in turn, have caused serious injury to the worker ... 'Víctor Bosch and Pérez Roa are the real owners of Clínica del Dr. Seín,' the speakers denounced 'a series of manipulations with the sickness allowances of the workers and made very serious accusations of unpublishable activities attributable to Pedro Rosa and Ernesto Pino Vargas, with the approval and acquiescence of Pérez Roa and Víctor Bosch.'" This information includes a photograph of appellant with the caption "He is also accused." The article appears under a big headline which says "PÉREZ ROA AND BOSCH ACCUSED OF ANTILABOR PRACTICES." Exhibit A(6) begins with a heading which says "UTM of Bosch and Pérez Roa Does Not Keep Account of Union Money," and goes on with a statement of a judicial interrogatory made to them by 31 workers and which the UTM, "headed by Víctor Bosch and Juan Pérez Roa," answers. The article informs that the claimants-workers "assure that the UTM of Víctor Bosch and Pérez Roa 'has refused to return to them the money paid by them for such purpose'" (namely, for the purpose of receiving later an old-age pension).

274

The second cause of action is based on the information published in El Imparcial, issue of February 23, 1957, marked Exhibit B, that the action of UTM-IBL-AFL in the sense that by instructions of Juan Pérez Roa the workers of the Ponce Pier were instructed not to unload parcels consigned to El Imparcial, is in open violation of the Taft-Hartley Act which prohibits "secondary boycott." It is further informed that a grand meeting will be held "at Plaza de la Playa de Ponce at which 'sensational disclosures' will be made on the actions of Pérez Roa and Víctor Bosch which are regarded as 'highly censurable.'"

The third cause of action is based on Exhibit C, which consists of a paper clipping from El Imparcial, issue of February 25, 1957, entitled "ILA Accuses UTM of Maintaining Terrorist Gangs," pointing out that "The ILA leaders in San Juan considered the terrorists of the so-called Panic Squad as 'salaried irresponsible groups of certain factions which operate within the movement headed by Pérez Roa and Bosch, and it considered as secondary boycott and a violation of the Taft-Hartley Act the action of the Ponce gangs ... in obstructing the unloading of parcels consigned to El Imparcial." The article further informs that "the leaders of ILA in San Juan ... had also denounced the manipulations connected with Clínica Seín, but that Pérez Roa and Bosch, 'instead of answering the charges made by ILA in a handbill in connection with the matter of the clinic, published a libelous handbill signed by irresponsible workers.'" The photographs of Bosch and Pérez Roa are published in the middle of this article.

The fourth cause of action hinges on Exhibit D, which is a clipping from El Imparcial of March 2, 1957 containing certain information entitled "Bosch Gang Causes Scandal in Front of WAPA" and a photograph of appellant, in which it is said of appellant, "Deviating from his professional mission as attorney at law and becoming wholly a provoking agent

who could have caused a riot of great proportions in front of WAPA-TV . . . Víctor M. Bosch, who not long ago was issued a license to carry weapons, headed a large number of men foreign to the personnel on strike of El Imparcial encouraging them with strident shouts to insult, vex and injure Lic. Ayuso." It further informs, "that gang of irresponsibles headed by Bosch, one of the most incurable spongers of ignorance . . . Víctor Bosch assembled a gang of those who do not reason except on terms of 'might and main' and caused a boisterous gabble in front of WAPA-TV . . . the men who together with Bosch looked like caged beasts or cooped-up bulls. . . a gang instigated by Víctor Bosch. . . Disappointed because his provoking attitude in front of WAPA-TV did not have the desired result, Víctor Bosch convinced his unconditional followers to start a march on El Imparcial. . . However, the wild march was dissolved when Captain Benigno Soto. . . held him publicly responsible for whatever might happen as a result of this exotic type of demonstration which the authorities considered most provocative."

Exhibit D(1) is also the object of the fourth cause of action. It consists of a clipping of the issue of March 2, 1957 of El Imparcial in which there is published a photograph of persons carrying placards reading "Bosch Gang Causes Scandal in Front of WAPA," and also "A group of provoking agents headed by Víctor Bosch."

The fifth cause of action is based on an information published in El Imparcial, issue of March 5, 1957, marked Exhibit E, in the sense that a leader of the UTM-IBL "alleges that there exist among the top leaders of that labor union illegalities, abuse of power, intimidations, threats and violations of existing regulations, and that no laborer would dare to protest for fear or reprisal on the part of Juan Pérez Roa, Víctor Bosch and other hierarchs of the Union." Reference is made in this article to the Union leaders as " 'wolves of the

Union,' 'the almighty of the Union,' violate openly the regulations, applying them unilaterally whenever it suits their interests ... 'the bosses of the Union' manage to intimidate, convince or compel the foremen to decree dismissals, changes and promotions of the laborers who are not their unconditional supporters ... The fear, the situation of fear maintained by 'the bosses of the Union' did not permit the protest."

The sixth cause of action is based on Exhibit F, a clipping from El Imparcial, issue of March 6, 1957, on a certain incident as a result of which a labor leader was charged with assaulting a laborer who "demanded the resignation of the present board of directors of the UTM 'in order to put an end to the dictatorship of Pérez Roa and Víctor Bosch.' " It further refers to a certain information filed against a certain person "of the gang of Pérez Roa and Bosch" for assault and battery on another with a folding knife.

The seventh cause of action is based on Exhibits G and G(1). The first is the headline of El Imparcial of March 7, 1957 which reads: "UNION OF ROA AND BOSCH TRIED FOR UNLAWFUL ACTS." The second is the information published in the same issue of that newspaper to the effect that, according to one Alfredo Arroyo, "one of the 'utemistas' who fight Víctor Bosch, Juan Pérez Roa and Pedro Rosa ... Referring in detail to the much-discussed matter of Clínica Biascoechea the alleged purchase of which by Dr. Seín has been the object of much comment ... he said that the workers expect at any moment the intervention of the FBI to investigate and clarify the case."

As eighth cause of action it is alleged that in El Imparcial of March 8 there were published certain reports, marked Exhibits H, H (1) and H (2), informing under the headline that "UNION of Roa and Bosch Desist from Unlawful Acts" ... ; that according to a spokesman of another Union, "this is not the first time that the UTM makes a stipulation of that type" (agreeing to desist from a certain practice)

"and then it does not abide by it . . . the UTM-IBL of Bosch and Pérez Roa, knowing that ILA had made a collective agreement with San Juan Mercantile, used coercion and violence against '*ilaístas*' to prevent them from unloading three vessels."

Exhibit H(1) is an editorial published on that date in El Imparcial to the effect that "the public opinion is sternly focused on certain union leaders whose conduct in the management of their unions and in the administration of the funds of the working people leaves much to be desired." It makes reference to the state of corruption prevailing in the high spheres of the Transportation Union of the United States. It also points out that in Puerto Rico "the workers themselves are the ones who resort to the judicial remedy to put a stop to the malpractices and manipulations of their leaders." It then refers to a complaint filed by old laborers who, "having contributed during 16 years to the Welfare Fund of the Pier Workers Union and being insolvent and unemployed at this moment, do not receive the help to which they are entitled, in their opinion, from the Union headed by Víctor Bosch and Juan Pérez Roa . . . those leaders allege that the Union does not keep any accounting of the contributions made by its members to the Welfare Fund, and that they have no information on the amount of receipts of that Fund."

Exhibit H(2) is the headline of El Imparcial of March 8 which says: "UNION OF BOSCH AND ROA DESISTS FROM UNLAWFUL ACTS."

It is alleged that Exhibits I and I(1) support the ninth cause of action. The first is a clipping from El Imparcial of March 12, 1957 on insults and provocations by several dozen workers brought from the Island who have nothing to do with El Imparcial and who, under the leadership of Víctor Bosch, Colón Gordiany and Hipólito Marcano, sur-

rounded the building of El Imparcial "proferring insults and provocations ... The scandal was of such nature and the insulting words proferred by them were of such magnitude that, had it not been for the composure ... of the personnel of El Imparcial, it would have given rise to personal encounter or to a riot of unpredictable consequences ...For more than 30 minutes the gang kept proferring indignities and slanders against the loyal employees of El Imparcial, and then they crowded in front of the door blocking the entrance to the building which had to be closed in order to prevent some of the demonstrators, who are not employees of El Imparcial on strike but from other towns of the Island, from trying to break into the building."

Exhibit I(1) refers to two letters of congratulation to El Imparcial for an editorial and a letter saying that "Pérez Roa and Víctor M. Bosch, who will not deceive anyone because all of us pier workers know them," withdrew from certain labor elections.

The tenth cause of action is justified on the basis of Exhibit J, which consists of a clipping from El Imparcial of March 12, 1957, commenting again the complaint for old-age pensions filed by 31 laborers, in which it is informed that these persons allege that they were compelled to sue "because of the attitude of the Union leaders, headed by Juan Pérez Roa, who has said, as alleged by plaintiffs, that 'in the UTM there is nothing for old people' ... Plaintiffs allege that 'the leaders of the UTM resort now to the subterfuge that they do not keep accounts of the moneys paid to that Union,' adding that 'no one will believe such argument since it is known that port laborers contribute thousands of dollars to the general Union funds' ... 'If it is true that the directors of the UTM do not keep accounts of the money paid to the Union, it will be well to ask, how are the financial affairs of such a powerful Union as the UTM handled?' ... Many

others who are affected . . . 'do not dare raise their voice for fear of reprisal by the dictatorship of Pérez Roa and his supporters at the head of the UTM.' "

Exhibit K, on which the eleventh cause of action is based, is a certain information published in El Imparcial on March 15, 1957 to the effect that certain members "of the Union headed by Juan Pérez Roa and attorneys at law Víctor Bosch and Francisco Colón Gordiany, who have become dirty crooks, stoned savagely the automobile" of an employee of El Imparcial. A photograph of Víctor Bosch, labelling him "Legal Counsel," is attached to this information.

The twelfth cause of action is based on Exhibits L, L(1) and L(2) which are clippings from El Imparcial of March 16, 1957. Exhibit L refers to statements made by Ramón Ojeda, under the headline "They Hope Meany and Bradley Will Put an End to the Abuses of the Leaders of UTM-IBL," that these gentlemen will explain " 'the history and record of each of the leaders who are living at present on the sweat of the pier workers' . . . that none of the boasting leaders of the UTM-IBL has done anything for the pier workers. It refers undoubtedly to Víctor Bosch and Juan Pérez Roa. 'All they have done is to divide the unions and make us fight each other while they do as they please' . . . In addition to the cruel and bitter realities of the abusive policy put in practice by the present leaders of the UTM-IBL headed by Víctor Bosch, Pérez Roa and Colón Gordiany . . ."

Exhibit L(1) relates an incident respecting a telegram which appellant sent to Ayuso Valdivieso asking him to set a date, hour and cost for the use of time of WITA to answer his speech and which he never answered. El Imparcial denied receipt of such telegram, but admits that radio station WITA received such a telegram.

Exhibit L(2) indicates that two individuals who attacked with stones the automobile of an employee of El Imparcial were charged with malicious damages, pointing out that the

two individuals are members of the Union headed by Juan Pérez Roa and attorneys at law Víctor Bosch and Francisco Colón Gordiany.

The thirteenth cause of action is based on an account contained in Exhibit M, published in El Imparcial on March 18, 1957, reporting an assault with a knife on an employee of El Imparcial who received wounds on an arm and on the back, perpetrated by one Alberto Pérez Pérez, "Vice Chairman of the Brotherhood of Graphic Arts Workers and Subsidiary Branches, the counsellors of which are Víctor Bosch and Colón Gordiany."

The fourteenth cause of action is based on the editorial of El Imparcial of March 19, 1957, marked Exhibit N (1), and another information published the same day in that newspaper, marked Exhibit N (2). The editorial in question informs that "on the other hand, the cunning poniard continues to function against our loyal employees, one assault after another, encouraged by the 'criminal, antisocial and disturbing element who threatens with violence and exercises it freely in the same way as in New York where not long ago certain individuals paid highwaymen to throw nitric acid on the eyes of a journalist who remained blind the rest of his life because he denounced from the newspaper columns the racketeers who have converted labor unions into shelters of crooks, unscrupulous exploiters of laborers and employers, instead of social and economic progress agencies.'" Attached to this editorial is a cartoon captioned "THE GRASPING TRIO," one of which is designated as Víctor Bosch carrying a placard which reads: "Fellow Strikers: Here we are to give you encouragement—That is all we can offer you! Because about That . . . NOTHING! 'Our friendship is on condition that what is mine is mine and what is yours is ours.'" Exhibit N (2) is a photograph of Alberto Pérez, to whom reference was made in Exhibit M, shortly after he was released on bail for attempt to kill with a knife a chauffeur

of El Imparcial. Reference is made again in this information to the fact that Pérez is "Vice Chairman of the Brotherhood of Graphic Arts Workers and Subsidiary Branches ..." counselled by Víctor Bosch and Colón Gordiany.

The fifteenth cause of action is based on Exhibits O(1) and O(2). Exhibit O(1) consists in the reproduction of the cartoon of Exhibit N(1) (Grasping Trio) which is attached to a report on an information for misappropriation of $322,000 of the Truck Drivers Union against its chairman Dave Beck, and another against its vice chairman, James R. Hoffa, for obstructing the senatorial investigation. At the bottom of the cartoon it is stated that it is reproduced at the request of friends, and it is said: "which becomes more significant at a time in which astray union managements are being scrutinized by the public opinion."

The sixteenth and last cause of action alleges that according to Exhibit P, published in El Imparcial on March 13, 1957, two individuals "together with other professional instigators, among whom were Víctor Bosch, Colón Gordiany and Marcano, headed the dozens of laborers who on Sunday morning ... arrived in front of EL IMPARCIAL building and for more than 30 minutes kept proferring indecorous words, vicious attacks and provocations to the employees of this newspaper." The following is added at the end of this information: "ED. N.  Chu Castro Molina, the provoking agent, was denounced and arrested, but the evasive bosses of the provoking gang, Bosch, Colón Gordiany and mason Hipólito Marcano, excused themselves and went out by the rear. And lieutenant Alvarado forgave them."

In each cause of action it is alleged that as a result of the facts alleged plaintiff has suffered damages amounting to $3,000.

The complaint also includes, as allegations common to all the causes of action, the following:

"In the informations referred to in the causes of action alleged in this civil action defendants have published, sold and cir-

culated in EL IMPARCIAL, maliciously and in bad faith, repeatedly, continuously and insistently, on the dates above-mentioned, a series of false and libelous accusations branding plaintiff as a 'racketeer,' a term which entails the usual and general acception of thief and robber; imputing to plaintiff personal actions of a highly censurable moral character; accusing him further of concocting with the employers for the purpose of betraying and surrendering those whom he represents and his clients; accusing him with making ill use of the funds under his custody as trustee of the Pier Workers Welfare Fund; implying and suggesting misappropriation of the deposits in that Fund for his own benefit; accusing plaintiff of heading gangs of terrorists by carrying out acts of violence and terror; accusing plaintiff of being co-owner of Clínica Dr. Seín, an entity which renders services under a contract to the Welfare Fund represented by plaintiff as trustee, and accusing him further of receiving, in his capacity of trustee, an unlawful economic benefit, thereby profiting as a labor leader by exploiting and deceiving the workers.

"Using EL IMPARCIAL as a commercial publishing, promotion and propaganda enterprise, and in reprisal and vengeance for the strike called against it by the typographical personnel, with malice, bad faith and with knowledge of its lies and malicious information, defendants have made the imputations and accusations described hereinabove in an unprivileged publication with the deliberate and preconceived purpose of exposing plaintiff to hatred, contempt and ridicule of the people and of depriving him of the public confidence and social intercourse."

In opposition to this complaint appellees filed a motion to dismiss alleging that neither the complaint nor any of the several causes of action therein state facts sufficient to constitute a cause of action against appellees. The trial court granted the motion and, in view of appellant's refusal to amend his complaint, it rendered judgment on October 13, 1959 dismissing the complaint, with costs and without awarding attorney's fees. The elaborate order of the trial court decides that on the face thereof it appears that the communications in question are not libelous as respects plaintiff, although they might be respecting other persons therein men-

tioned; that since their language is direct and clear, they are not susceptible of clarification by innuendo which could make them libelous per se; and that the communications, as far as appellant is concerned, are privileged, first, because they consist of information of public interest which El Imparcial has the duty to furnish to its readers; second, because they do not contain any comments nor information respecting plaintiff which may be considered unfair or which may imply lawful malice; and third, appellee, a labor leader on strike against El Imparcial, had abandoned his condition of private citizen and has submitted his person, his acts and his judgments to the consequent critical examination. Lastly, the said order decides that the terms of the publications proper, insofar as they refer to plaintiff, fail to show malice; that the allegation of express malice is not sufficient by itself to support the complaint; and that in such case special damages should also be alleged specifically as provided by law, which is not done in the complaint.

In his petition for review appellant alleged that the trial court committed three errors, to wit:

"I. Error in determining that from the face of the communications published in El Imparcial newspaper, as set out in the complaint, 'it does not appear that they were libelous as respects plaintiff, although they might be respecting other persons therein mentioned.'

"II. Error in holding that 'the terms of the publications of El Imparcial newspaper,' as set out in the complaint, 'do not show lawful malice and, consequently, the same are not actionable per se,' and that specific damages should be alleged.

"III. Error in concluding that 'from the terms of the communications objected to and, therefore, from the face of the complaint, it appears that such communications are privileged as respects plaintiff.' "

1. The action for damages for libel and slander was established in Puerto Rico by the Act of February 19, 1902, 32 L.P.R.A. §§ 3141-49. That Act defines libel as follows:

"Section 2.

"Libel is the malicious defamation of a person made public by writing, printing, sign, picture, representation, effigy, or other mechanical mode of publication tending to subject him to public hatred or contempt, or to deprive him of the benefit of public confidence and social intercourse, or to injure him in his business, or in any other way to throw discredit, contempt or dishonor upon him, or malicious defamation made public as aforesaid, designed to blacken or vilify the memory of one who is dead and tending to scandalize or provoke his surviving relatives or friends."

The authorities have distinguished between publications which are libelous per se and those which on their face are not libelous *per quod*. A publication imputing the commission of an offense is considered libelous per se and, therefore, no allegation or special proof of damages is required. *People* v. *Prensa Insular*, 69 P.R.R. 636 (1949) ; *Rivera* v. *Martínez*, 26 P.R.R. 692 (1918). The publication of a sworn complaint against an attorney charging him with false representation and fraud constitutes libel per se. *Benet* v. *Hernández*, 22 P.R.R. 461 (1915). The imputation need not necessarily be an offense. It is sufficient that it tend to throw discredit, contempt or dishonor or to expose the person to the public hatred or contempt, or to deprive him of the public confidence and social intercourse, or to injure him in his business. Charging an attorney with being a "swindler" in connection with a matter in which he acted as such is libel per se. *Forés* v. *Balzac*, 29 P.R.R. 207 (1921). In *Maidman* v. *Jewish Publications, Inc.*, 355 P.2d 265 (Cal. 1960), the publication accused a prominent leader in religious affairs of being unworthy of his high position, of knowing less about his religion than an adolescent child, and of causing the members of his religion to look ridiculous. The complaint was dismissed by motion. It was afterwards reversed as constituting libel per se and not a fair comment, since it exposed Maidman to the contempt and ridicule of other members

of his religion. In *Brown* v. *Du Frey*, 134 N.E.2d 469 (N.Y. 1956), an article was published in a newspaper informing that a woman disinherited her husband in a will declaring that she did it intentionally "because of the fact that during my life time he abandoned me, made no provision for my support, treated me with complete indifference and did not display any affection or regard for me." The husband alleged that this was false. There was no evidence to the contrary. The court held that such article was libelous per se, that it exposed the husband to public contempt and tended to induce an evil opinion of him in the minds of right-thinking persons and to deprive him of their friendly intercourse in society. In *Muchnick* v. *Post Publishing Co.*, 125 N.E.2d 137 (Mass. 1955), an editorial charged plaintiff with conducting disorderly meetings of the School Committee of Boston and engaging in disgraceful and insulting behavior and acting in his own interests. The court concluded that these allegations were sufficient to state a cause of action, particularly since it was alleged that the publication was malicious. In *Murphy* v. *Farmers Educational and Cooperative Union*, 72 N.W.2d 636 (N.D. 1955), an article charged a state official with receiving huge expense account for soliciting funds for a voluntary association claimed to promote the interest of the large corporations to the detriment of small dairy farmers. A demurrer was overruled in this case on the ground that such article was libelous per se. In *Jeffers* v. *Screen Extras Guild*, 237 P.2d 51 (Cal. 1951), it was held that the information contained in a newsletter to the members of a certain union accusing plaintiff of being a demagogue and a dictator in his character as a union leader, who sought to further his own ambitions at the expense of the union members, of permitting open shop, of associating with a communist influenced union, of using a scandal sheet and a blacklist to destroy the union. However, in 328 P.2d 1030 (Cal. 1958), it was afterwards held in this case that that letter was not

libelous because it was circulated within the ranks of a union during a dispute between contending factions over union policies. In *Dethlefsen* v. *Stull*, 195 P.2d 56 (Cal. 1948), it was held that a letter sent by defendant to the customers of a dissolved firm of which he was a partner, informing "Among other things an audit of the books disclosed that, over a period of months, Mr. Dethlefsen had received moneys belonging to the firm in the sum of about $1400 which he had failed to deposit to the firm's account," was libelous per se notwithstanding such information did not impute the commission of an offense. In the opinion were cited the cases of *Jimeno* v. *Commonwealth Home Builders*, 191 Pac. 64 (Cal. 1920), in which it was held that the false charge of violation of confidence or treachery to his associates was libelous per se; and *Tonini* v. *Cevasco*, 46 Pac. 103 (Cal. 1896), in which it was also held that a certain information that defendant was discharged by plaintiff for reprehensible conduct was libelous per se. *Rooney* v. *Feinstein*, 76 N.Y.S.2d 77 (1947), involved a superintendent of highways, an asphalt foreman and a mechanic of the borough—public officers—of whom it was said in an article that the friendly relations and efficiency of the Queens Borough President's office were being retarded by the arbitrary and capricious attitude of the former against the interests of Queens Local 107 AFL; that the employees of such office would not tolerate the attempt of such subordinates to destroy the Union by threats, intimidation, etc.; that egomaniacs and others who sought personal advantage at the expense of the group and those who sought political favor without appropriate political action had no claim on elected officials. It was held that any false accusation which dishonors or discredits a man in the estimate of the public or his friends and acquaintances or has a reasonable tendency so to do, or injures his reputation and thereby exposes him to public hatred, contempt, scorn, obloquy or same, is libelous. In *Thackrey* v. *Patterson*, 157 F.2d 614

(1946), defendant published that plaintiff wife had bought the plaintiff husband with money; that she found him disappointing as an editor and inadequate as a husband; that she desired another man in both capacities ... It was held that such publication was libelous per se without need of allegations of special damages.   On the contrary, in *Fajardo* v. *Sabater*, 20 P.R.R. 37 (1914), it was held that a letter dismissing a municipal employee for filing a complaint against the dismissing mayor, based on false facts, and stating that this action would establish an improper, lamentable and incorrect precedent, is not a libel in the absence of the necessary innuendo, that is, the libelous signification which plaintiff ascribes to those phrases.   In *Perea* v. *Gómez Hermanos*, 21 P.R.R. 25 (1914), it was held that certain rumors that the governor has asked for the resignation of the mayor, and the following day that "we do not want the mayor to resign, his failure and incompetency will follow," is not a libel per se committed by a newspaper; to constitute a cause of action, it is necessary to allege other element or elements, that it was injurious and without justifiable motive, and also some particular injury should have been alleged.   In *Moraza* v. *Rexach Sporting Corp.*, 68 P.R.R. 433 (1948), it was held that the epithet "thief" was not used literally to impute the commission of an offense, but that the phrase was uttered figuratively as a mere term of abuse in an outburst of excitement and passion.   Where the libel does not arise from the face of the publication but from facts not apparent upon the face thereof, namely, in cases of libel *per quod*, plaintiff has the burden of pleading and proving such facts by means of what is called "inducement." He must also establish the defamatory character of the publication with reference to such facts, namely, the "innuendo."   If the publication makes no reference to plaintiff, plaintiff must sustain the burden of pleading and proof, by way of "colloquium," that the defamatory meaning attaches to him.

288

PROSSER, Torts 582-83 (2d ed.). In libel cases, unlike those of slander, the original rule was that it was actionable, without the necessity of alleging specific damages. This is still the rule in a minority of American jurisdictions in cases of libel per se as well as in those of libel *per quod,* and it was adopted as the rule in Restatement of Torts, § 569. See PROSSER, *supra,* p. 587. The *Perea* case, *supra,* seems to indicate that this Court has established the rule adopted by a majority of the American courts that where the libel does not arise from the face of the publication, it is not actionable unless specific damages are proved.

The bearer of a libel is as guilty as its author. *Davis* v. *Macon Telegraph Publishing Co.,* 92 S.E.2d 619 (Ga. 1956). In *People* v. *Prensa Insular,* 69 P.R.R. 636 (1949), it was held that a caricature together with the article was libel per se in that case.

■ 2. Although libel may be apparent on the face of the information, the publication of the latter may not be actionable because such publication is privileged according to § § 4 and 5 of our Libel and Slander Act. 32 L.P.R.A. § § 3144-45.[1] It is well to point out that this defense of privilege is more qualified in Puerto Rico than in other jurisdictions

---

[1] "Section 4.

"A publication or communication shall not be held or deemed malicious when made in any legislative or judicial proceeding or in any other proceeding authorized by law. A publication or communication shall not be presumed to be malicious when made:

"First: In the proper discharge of an official duty.

"Second: In a fair and true report of a judicial, legislative, official or other proceeding, or of anything said in the course thereof.

"Third: To a Commonwealth official upon probable cause with the intention of serving the public interest or of securing the redress of a private wrong.

"Section 5.

"Malice shall be presumed to exist in any injurious communication or writing made without justifiable motive and addressed to any person other than to a relative within the third degree, or to a person whom the author has under his guardianship or when said communication passes between persons having business in partnership, or other similar association."

where the common-law rule has been adopted. In *Díaz* v. *P.R. Ry., Lt. & Power Co.*, 63 P.R.R. 776 (1944), this Court established the principle that this question of privilege is purely statutory.

██ Unless the privilege is apparent on the face of the complaint, as for example when the complaint alleges that the libel consists in the fair and true publication of a judicial proceeding, in which case a motion to dismiss should be granted, the rule is that the defense of privilege can not be pleaded by way of motion to dismiss or by demurrer. *Foltz* v. *Moore McCormack Lines*, 189 F.2d 537 (C.C.A. 8, 1951); *Carr* v. *Watkins*, 177 A.2d 841 (Md. 1962); *Sullivan* v. *Republican Publishing Company*, 177 N.E.2d 774 (Mass. 1961); *Murphy* v. *Farmers Educational & Cooperative Union, supra; International Dial Co., Inc., et al.* v. *Group et al.*, 82 N.Y.S.2d 25 (1948); *Rooney* v. *Feinstein, supra; Roethke* v. *North Dakota Taxpayers Ass'n*, 10 N.W.2d 738 (N.D. 1943); 51 A.L.R.2d 554; YANKWICH, *The Protection of Newspaper Comment on Public Men and Public Matters*, 11 La. L. Rev. 327, 343 (1951). However, according to Rule 10 of the Rules of Civil Procedure in force in this jurisdiction, even if the facts and circumstances of the privilege are not apparent on the face of the complaint, perhaps such motion may be made under subd. 2 or subd. 3 of the rule, provided such facts and circumstances are stated in the motion and compliance is had with the other applicable provisions of the said rule.

Let us examine now the case of *Caraballo* v. *P.R. Ilustrado, Inc.*, 70 P.R.R. 265 (1949), cited in the order of the trial court in support of some of its conclusions. According to the facts of this case, El Mundo published certain information on a complaint filed in a municipal court for alleged offenses of false pretenses and cheats charging Pérez with attempting to change a one-dollar bill split into two in a bank, and charging Caraballo with delivering it to Pérez. It was

added that in San Juan an individual paid his bus fare with a bill from which the reverse side had been separated and afterwards he paid to a chauffeur with the obverse, and that it is unknown whether the individuals arrested have any connection with these cases. It was alleged as a defense that the publication was privileged. The libelous character of the article was admitted. It was alleged that the article was not a faithful copy of the source of information which defendants alleged served them as a basis thereof, but that it was altered, and that besides, a final paragraph was added insinuating that plaintiff was connected with other crimes of a similar nature committed in San Juan. It was held that a newspaper is entitled to privilege when publishing the contents of the entries in the Police Blotter, subject to the condition that it be a fair and true report of the contents —the information was found to be a fair and true report of the entry. The addition at the end did not mention Caraballo. This Court said: "The newspaper as public informant had a right to make fair, true and accurate comments in connection with the news published"—they were, except that it referred to the "persons arrested" when in fact plaintiff was not—"the newspaper was entitled to logically infer that he had been arrested."

3. Lastly, it remains to analyze briefly the rule on the defense of fair comment invoked in the order of the trial court as basis for dismissing the complaint in this case. Prosser says that it is to the interest of the public as to what takes place in public affairs, a qualified privilege is recognized under which a newspaper or anyone may make such a report to the public. The report must be fair and accurate. The privilege does not cover false statements of fact, the interpolation of defamatory matter, or a one-sided account. The privilege is forfeited if the publication is "malicious," that is, if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection. If

defendant *acts chiefly from motives of ill will*, or to accomplish a distinct objective which may not be legitimate in itself, such as to increase the circulation of a newspaper, he is given no immunity.   The burden of proof is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the publication.  Once the existence of the privilege is established, the burden is upon the plaintiff to prove that it has been abused by excessive publication or by use of the occasion for an improper purpose. PROSSER,  Torts  623–29  (2d  ed.).  The  characterization of fair comment as a privilege lends itself to confusion, especially in a jurisdiction such as ours where it has been held that the only source of privileged publication is statutory. The fact is that the defense of fair comment stems from the constitutional right of freedom of speech and press limited by the right of every person to protection against abusive attacks on his honor, reputation and private or family life.  Sections 4 and 8, Art. II, Constitution of Puerto Rico. (L.P.R.A., Vol. 1, pp. 179 and 180.)   It differs, therefore, from the defense of privilege in that it may be pleaded by any individual, newspaper or magazine and may be used provided the comment is based on matters of public interest.  The difference is stated with greater clarity in *O'Regan* v. *Schermerhorn*, 50 A.2d 10 (N.J. 1946), as follows:

"Preliminarily it must be noticed that the defense of fair and bona fide comment upon the criticism of matters of public interest and concern and the defense of privilege are not identical—they are separate and distinct.  In the latter case the words may be defamatory, but the defamation is excused, by reason of the special occasion, on grounds of public policy, while in the former case the comment and criticism are not privileged by reason of the occasion in the strict legal sense.  What is really meant is that such comment and criticism, if fair, made in good faith and founded on fact, are not defamation of the plaintiff, and hence not libelous—the stricture or criticism is not upon the person himself, but upon his work."

292

■ According to Thayer, fair comment to be valid and legally acceptable must possess the following attributes:

(a) The comment must be an intellectual appraisal or evaluation.

(b) The comment must be founded upon facts, or what in the mind of a reasonable man would normally be accepted as facts.

(c) The comment must be free from any imputation of sordid or corrupt motives.

(d) The comment must be the result of honest opinion.

(e) The comment must be free from malice.

(f) The comment must be upon a subject possessing public interest. THAYER, Legal Control of the Press 397–404 (1956).

■ Stated in the negative side, the elements of fairness are absent (1) if the publication contains attacks on the motives and character of the person, unrelated to the matters as to which the comment or criticism relates, (2) if it discusses his private life as to matters not connected with the work or activity which is the subject of criticism, and (3) if it accused him of crime or employs degrading or insulting epithets, other than those necessary to characterize his unfitness for, or unfaithfulness in, office. YANKWICH, *The Protection of Newspaper Comment on Public Men and Public Matters*, 11 La. L. Rev. 327 (1951).

The comment may be severe and caustic and even consist in a strict and inexorable criticism provided it is based on facts or on such inferences from the facts which, in the mind of a reasonable person, constitutes a fair evaluation of a situation. But distinction must be established between unfair criticism which may cause annoyance and vexation and a statement of a criminal act or disgraceful conduct without any ground. The criticism should be pertinent and not a means of concealing an invective or personal imputations which do not arise from the facts of the matter on which the criticism is

based. In labor disputes, the Supreme Court of California, construing a libel statute similar to that of Puerto Rico, has held that an article in a union newspaper accusing an employer of violating his agreement [2] by initiating a destructive labor policy, as well as a union letter informing potential customers of a bookbinding shop that its pay scale was lower than that of the union and that its rates were not based on its equipment, quality and service,[3] was a fair comment. However, in *Washer* v. *Bank of America*, 136 P.2d 297 (Cal. 1943), that court sustained a complaint for libel consisting in a statement made to the newspaper, following a decision of the National Labor Relations Board ordering plaintiff's reinstatement, charging him with being guilty of flagrant insubordination and calling the inhabitants of the community "yokels" and "country bumpkins," and labelling the town "Siberia." Although plaintiff admitted that the comment was made on a conditionally privileged occasion, he alleged that it was made with malice for the purpose of injuring and defaming plaintiff and interfering with his ability to obtain employment, and with knowledge that it was false and that he did not have probable cause, or any cause, for believing it to be true. The case was afterwards decided on the merits in favor of defendant on the ground that the veracity of the imputations had been established and that the same were not libelous, since it merely amounted to a statement of opposition to the Board's ruling and an explanation of the reasons why the bank felt that plaintiff should not be reinstated. See GILBERT, *Privileged Publication in Labor Disputes under California Libel Laws*, 30 So. Cal. L. Rev. 35 (1956). It is to be noted that the publication in this case is privileged under § 47 of the Civil Code of California, which is not so in Puerto Rico, so that the court held that, notwithstanding the fact that the publication was libelous per se, it was necessary to plead and

---

[2] *Emde* v. *San Joaquín County, etc.*, 143 P.2d 20 (Cal. 1943).

[3] *Smith* v. *Los Angeles Bookbinders Union*, 284 P.2d 194 (Cal. 1955).

294

then prove that it was made with malice in order to overcome the defense of privilege, the latter having failed.[4]

4. In support of their contention that the publications in this case amount to a fair comment, appellees cite the case of *Broking* v. *Phoenix Newspapers*, 264 P.2d 413 (Ariz. 1953), in which it was held that the publication of a picture of a dead dog chained to a post with a comment that the dog, man's best friend, had died of heat, thirst and starvation and that the neighbors blamed its master and that the humane officers were looking for its owner, vowing that they would prosecute him as far as possible for the terrible thing he had done, was libel per se. However, it was held that the trial court having ruled in that case that the publication was qualifiedly privileged, the burden shifted to plaintiff to show not only actual malice but also the falsity of the publication. This case is strange, since the court concluded that the publication was libelous per se and yet it held that it was privileged because it was published in the public interest by one whose right it was to inform the public of the matter. The court added that as soon as it is held that the publication is a fair or privileged comment, the burden is upon the plaintiff to prove both the falsity of the publication and that defendant was actuated by malice in fact. We believe that the best and more logical rule is that of the *O'Regan* case, *supra*, as to the nature of the fair comment—namely, that if the publication is libelous, as a general rule it is not also a fair comment, and if it is the latter, it should not be libelous. The defense of privilege is rather directed to excuse, to deprive the aggrieved party of a cause of action with respect to that which is libelous in law.

Appellees also cite the case of *Kinsley* v. *Herald & Globe Ass'n*, 34 A.2d 99 (Vt. 1943). In this case an article was

---

[4] Section 47 of the Civil Code of California provides in its pertinent part: "A privileged publication or broadcast is one made . . . 5. By a fair and true report of (1) the proceedings of a public meeting . . . or (2) the publication of the matter complained of was for the public benefit."

published in a newspaper under the title "A Legal Racket," in which it was claimed that a certain individual and his wife had been awarded $12,800 for injuries sustained in an automobile accident in a car driven by their son, in a suit brought against the son. The article added that "We leave it to the imagination of our readers to guess who is paying the bill in this pleasant little family affair." It was alleged as a defense that the subject matter of the publication was of importance and interest to all persons residing in the territory through which the newspaper circulated and to the public generally; that the article was a true and accurate statement of the facts and that the balance was a fair and reasonable comment and criticism of a matter of public interest; that defendant was not actuated by malice or an intention to injure plaintiff, but only by a desire to call the attention of the public to a matter of great public interest. *Plaintiff demurred to this defense.*[5] The court held that the language of the article was libel per se and that the demurrer to said defense should be and was sustained. Although matters of public interest are legitimate subject matters of criticism and everyone has a right to comment thereon as long as he does so fairly and with an honest purpose, the court in this case held that the facts did not warrant comment reflecting upon plaintiff personally and tending to blacken her reputation. They also cite the case of *Bailey* v. *Charleston Mail Ass'n*, 27 S.E.2d 837 (W. Va. 1943), for the same purpose, namely, to support the contention that the publications objected to in this case constitute a fair comment of a matter of public interest. In that case the action of libel was based on a newspaper editorial informing on the abounding scandals of the Neely administration of the State of West Virginia in connection with the purchase of a bridge which had declined greatly, and to that effect plaintiff, instead of purchasing directly on behalf of the State, did so through

---

[5] Namely, the equivalent of a motion to strike or to dismiss.

an agent who first optioned the bridge in the sum of $990,000 and then sold it to the State for $1,040,000, "a neat clean-up of $50,000." Bonds on behalf of the State were issued afterwards to pay for the bridge—"here, then, was a sure prospect of more 'gravy' which no very smart politician of the Neely Deal could be expected to overlook." The face of the bonds was $1,040,000, but they were sold at private sale (no competitive bidding permitted) to a bonding house "of our same old friend, the Cabell county politician." "There are those who know, probably, just what the Cabell gentleman's slice was in this transaction—we don't." Plaintiff was neither Neely nor the Cabell county politician. It was alleged that the language implied that plaintiff had stolen or misapplied money or property belonging to the State of West Virginia; that he acted corruptly in relation to the purchase of the bridge; and that he was neglectful and incompetent in the performance of his duties. Privilege and fair comment were pleaded as a defense. Plaintiff demurred to this defense and when it was overruled he appealed. The defense alleged the truthfulness of the facts and that the balance constitutes a fair comment thereon without the purpose of causing damage to plaintiff, in good faith, on a matter of public concern. The court held that treating the matters alleged in the plea to be true, the comments were not so violently or intemperately expressed as to transcend the right of fair comment *made on the basis of truth*. The court found that the facts stated were sufficient to support the inferences drawn by defendants as well as the comments. This case is not only distinguishable from the case under consideration as to the facts of the comment and criticism objected to, but also that the court itself admits that a majority of the American courts are in accord that the publication of false information regarding the official conduct of a public officer is not privileged. Appellees also rely on the case of *New York & Porto Rico S. S. Co.* v. *Garcia*, 16 F.2d 734 (C.C.A. 1, 1926). But this

Court already decided in the *Díaz* case, *supra*, at p. 784, that "our opinion in this case [namely, that in the case of Díaz] and not that of the Circuit Court of Appeals in *New York & Porto Rico S. S. Co.* v. *García* states the local law on the question of unqualified privilege under our local statute."

Summing up: (1) A publication is libelous per se not only when it imputes the commission of an offense but also when it tends to discredit, scorn, or dishonor or expose a person to the public hatred or scorn, or to deprive him of the public confidence or social intercourse, or to injure him in his business. In these cases it is not necessary to make a special plea of damages. (2) One who publishes a libel committed by another is in turn responsible for such libel. (3) Although libel may be apparent on the face of the publication, such publication may not be actionable for libel because it is privileged according to § § 4 and 5 of our Libel and Slander Act. (4) The defense of privilege may not be pleaded by motion to dismiss the complaint, unless the privilege is apparent on the face of the complaint, as would be the case of the absolute privilege of the true and exact publication of a judicial proceeding. (5) The defense of fair comment is not a privileged matter—in other words, that when a comment or criticism is fair, made in good faith, based on facts and on a matter of public concern, it does not constitute defamation even if it is severe and caustic.

Stating as briefly as possible the law on the complex matter of libel, we turn now to the difficult task of applying the same to the case before us.

The complaint, with a background of an existing strike between the union of which appellant is a top officer and defendant enterprise, states sixteen causes of libel, alleging as to all of them the bad faith and malice of appellees, the purpose of reprisal or vengeance for the strike, and the knowledge that the publications are false and tendentious. The complaint fails to claim specific damages, except for the sum

of $3,000 for damages in relation to each cause of action. In order to sustain each cause of action, it would therefore be necessary to conclude that from the face thereof libel per se is alleged in every one of them, since there is no allegation of any additional fact necessary to constitute libel, except as to the imputations relating to Clínica Dr. Seín with respect to which additional allegations are made in the paragraph of the complaint captioned Common Allegations.

We are examining only the sufficiency of the allegations of the complaint against a preliminary attack. To this effect, it has been generally held that in libel cases the courts should not grant a motion to dismiss for failure to state a claim, unless the words of the publication, jointly interpreted, and considering all the allegations of the complaint, are not reasonably capable of defamatory meaning. *Cf. Sullivan* v. *Republican Publishing Company, supra; Murphy* v. *Farmers Educational & Cooperative Union, supra; Rooney* v. *Feinstein, supra.* Furthermore, one of the basic principles of modern civil proceeding is to construe the pleadings in the light most favorable to the party making them.[6] Thus, it has been said that in deciding a motion to dismiss a complaint for lack of facts to warrant the granting of a remedy, the duty of the courts is not to test the final merits of the claim, but rather to consider whether, in the light most favorable to plaintiff and with every intendment regarded in his favor, the complaint constitutes a valid claim. *Sierra, Sec. of Labor* v. *Bird*, 78 P.R.R. 161 (1955); *Cruz* v. *Ortiz*, 74 P.R.R. 298 (1953); *Boulon* v. *Pérez*, 70 P.R.R. 941 (1950).

Having analyzed the allegations of the complaint, we conclude that the different causes of action allege facts sufficient to constitute prima facie causes of libel per se, with the exception of the second, sixth, seventh, twelfth and

---

[6] Rule 6.6 of the Rules of Civil Procedure of 1958 reads: "All pleadings shall be so construed as to do substantial justice."

thirteenth causes. In these five causes of action the publications on which they are based make no express reference to appellant nor tend to discredit, dishonor or scorn him, or otherwise affect him in the manner provided by law.

We therefore hold that the trial court should not have granted the motion to dismiss filed by appellees except as to the second, sixth, seventh, twelfth and thirteenth causes of action alleged in the complaint, and, therefore, it should not have rendered judgment dismissing the complaint in its entirety. Consequently, the judgment will be affirmed as to the second, sixth, seventh, twelfth and thirteenth causes of action; it will be reversed as to all the other causes of action alleged in the complaint in this case; and lastly, the case will be remanded for further proceedings not inconsistent with the terms of this opinion.

Mr. Chief Justice Negrón Fernández did not participate herein.

