VÍCTOR M. BOSCH, demandante y recurrente, *v.* EDITORIAL EL IMPARCIAL, INC., y ANTONIO AYUSO VALDIVIESO, demandados y recurridos.

*Número:* 236    *Resuelto:* 12 de febrero de 1963

286

*Víctor M. Bosch,* por su propio derecho; *Juan B. Soto, Juan F. Soto,* y *Carmelo Cintrón Ayuso,* abogados de los recurridos.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

El letrado Víctor M. Bosch, recurrente, radicó demanda por daños y perjuicios por libelo contra Editorial El Impar-

cial, Inc., y Antonio Ayuso Valdivieso, los recurridos, en la cual alegó que (1) el recurrente era Primer Vice Presidente de la Federación del Trabajo de Puerto Rico (Rama de Estado de la AFL-CIO), Vice Presidente del Comité Ejecutivo del Distrito de Puerto Rico de la Hermandad Internacional de Estibadores de Muelles y Ramas Anexas de Puerto Rico y de la Hermandad de Trabajadores de Artes Gráficas y Ramas Anexas de El Imparcial (AFL-CIO) y síndico de la Junta de Síndicos del Fondo de Bienestar (PRSSA-UTM) de los obreros portuarios; (2) que allá para el 9 de octubre de 1956, se organizó la Hermandad últimamente mencionada y que fue certificada como la unidad contratante apropiada; (3) que se inició negociación colectiva entre dicha Unión y la empresa recurrida que culminó en un estado de huelga con piquetes frente al edificio de talleres y oficinas de la referida empresa; (4) que los recurridos publicaron ciertas informaciones y gráficas en El Imparcial que son motivo de las diez y seis causas de acción que se alegan en la demanda las que se sintetizan así:

La primera causa de acción se basa en las informaciones unidas a la demanda marcadas A(1), A(2), A(3), A(4), A(5), y A(6), publicadas en El Imparcial en febrero 13, 14, 18, 19, 23 y marzo 2 de 1957. El Exhibit A(1) se refiere a una agresión cometida en la persona de un chófer de El Imparcial por un individuo llamado Jesús Castro Molina a quien se designa como miembro del "Escuadrón del Pánico, ganga terrorista que dirige Pérez Roa y que pretende sembrar el pánico entre los empleados leales de El Imparcial". El Exhibit A(2) vuelve a hacer referencia al mismo asunto, a Pérez Roa como director de la ganga terrorista designada "Escuadrón del Pánico" publicándose además la fotografía de éste con la designación "Dirige la ganga". El Exhibit A(3) vuelve a hacer referencia al "Escuadrón del Pánico, grupo terrorista que funciona en abierto desafío de las autoridades". El Exhibit A(4) informa "Una nueva agresión, como parte de la ola de desmanes y atropellos que el llamado

'Escuadrón del Pánico' ha desatado contra amigos y empleados de EL IMPARCIAL que no se han solidarizado con la huelga ilegal decretada por un grupo de trabajadores de los talleres, . . ." El Exhibit A(5) informa que un grupo de trabajadores de muelle de Ponce que militan en la UTM-AFL-CIO "abrió fuego contra los líderes principales de esa Unión, Juan Pérez Roa, Víctor Bosch y Pedro Rosa, haciéndoles gravísimas acusaciones y responsabilizándolos por el desorden administrativo que se ha entronizado en la Unión y que ha propiciado el renacimiento de los 'rackets' . . . Todos acusaron a Pérez Roa y a Víctor Bosch de ser los propulsores de una serie de combinaciones y maniobras que han favorecido a los patronos y, en cambio, se han traducido en grave perjuicio para el brazo trabajador. . . . 'Víctor Bosch y Pérez Roa son los verdaderos dueños de la Clínica del Doctor Seín', los oradores denunciaron 'una serie de maniobras con las dietas por enfermedad de los trabajadores y lanzaron gravísimas acusaciones de actuaciones impublicables que se atribuyen a Pedro Rosa y Ernesto Pino Vargas, con el visto bueno y beneplácito de Pérez Roa y Víctor Bosch.' " Esta información incluye un retrato del recurrente con el subtítulo "También lo acusan". El artículo está encabezado por un prominente titular que dice "ACUSAN PÉREZ ROA Y BOSCH DE PRÁCTICAS ANTIOBRERAS". El Exhibit A(6) comienza con un título que dice "UTM de Bosch y Pérez Roa No Lleva Cuentas de Dinero que Ingresa en la Unión" y continúa con una relación de un interrogatorio judicial que 31 trabajadores le hicieron y que la UTM, "que dirigen Víctor Bosch y Juan Pérez Roa" contesta. Informa el artículo que los trabajadores reclamantes "aseguran que la UTM de Víctor Bosch y Pérez Roa 'se ha negado a devolverles el dinero que pagaron con tal fin' " (o sea, con el fin de recibir luego una pensión por vejez).

Se ancla la segunda causa de acción en la información publicada en El Imparcial, edición de 23 de febrero de 1957, marcada Exhibit B, que la acción de la UTM-IBL-AFL en

el sentido de que por instrucciones de Juan Pérez Roa, se ha instruido a trabajadores del muelle de Ponce no descargar bultos consignados a El Imparcial lo que constituye una flagrante violación de la Ley Taft-Hartley que prohibe la práctica del "boycot secundario". Se informa además que se anuncia un gran mitin "en la Plaza de la Playa de Ponce donde se proponen hacer 'sensacionales revelaciones' sobre actuaciones de Pérez Roa y Víctor Bosch que califican de 'altamente censurable' ".

La tercera causa de acción se basa en el Exhibit C, que consiste de un recorte de información publicada en El Imparcial, edición de febrero 25 de 1957, con titular que dice "ILA Acusa UTEM Mantener Gangas de Terroristas" y que señala que "El liderato de la ILA en San Juan calificó a los terroristas del llamado Escuadrón del Pánico como 'grupos de irresponsables a sueldo de ciertas facciones que se mueven dentro del movimiento que dirigen Pérez Roa y Bosch y consideró como boycot secundario y violación de la Ley Taft-Hartley la acción de las gangas ponceñas . . . al obstaculizar el desembarque de bultos destinados a El Imparcial'." Más adelante el artículo informa que "los dirigentes de la ILA en San Juan . . . también habían denunciado las maniobras relacionadas con la Clínica Seín pero que Pérez Roa y Bosch, 'en lugar de contestar los cargos que se les hacían en hoja suelta de la ILA sobre el asunto de la clínica, lanzaron una hoja libelosa, con la firma de obreros irresponsables' ". En medio de este artículo se publican las fotografías de Bosch y Pérez Roa.

La cuarta causa de acción gira alrededor del Exhibit D que es un recorte de El Imparcial de 2 de marzo de 1957 de una información con titular "Ganga de Bosch Forma Escándalo Frente a WAPA" y fotografía del recurrente, en que se dice del recurrente: "Apartándose de su misión profesional como abogado y tirándose de lleno a la de agente provocador que pudo haber causado un motín de grandes proporciones frente a WAPA-TV . . . Víctor M. Bosch, que hace poco

recibió licencia para portar armas, capitaneó gran número de hombres extraños al personal en huelga de El Imparcial, alentándolos con vociferaciones estridentes para que insultaran, vejaran y atropellaran al Lic. Ayuso . . ." Luego informa "aquella turba de inconscientes que dirigía Bosch, uno de los más incurables explotadores de la ignorancia . . . Víctor Bosch reunió una ganga de los que no entienden más razones que la del 'mollero y la maceta' y formó una estrepitosa algarabía frente a WAPA-TV . . . los hombres que junto a Bosch parecían fieras enjauladas o toros acorralados . . . turba azuzada por Víctor Bosch . . . Decepcionado por que su provocadora actitud frente a WAPA-TV no surtió el efecto que esperaba, Víctor Bosch convenció a sus incondicionales para iniciar una marcha hacia El Imparcial . . . Empero la salvaje manifestación se disolvió cuando el comandante Benigno Soto . . . lo hizo públicamente responsable de lo que pudiera suceder a causa de este exótico tipo de demostración que las autoridades consideraron altamente provocativa."

El Exhibit D (1) da también motivo a la cuarta causa de acción. Consiste de un recorte de la edición de marzo 2 de 1957 de El Imparcial en que publica una fotografía de personas con cartelones con titular que dice "Ganga de Bosch Forma Escándalo Frente WAPA" y que añade "Un grupo de agentes provocadores dirigidos por Víctor Bosch".

Da lugar a la quinta causa de acción una información publicada en El Imparcial, edición de marzo 5 de 1957, marcada Exhibit E, en el sentido de que un lider de la UTM-IBL "sostiene que entre los magnates que gobiernan esa agrupación sindical existe una situación de ilegalidades, de abusos de poder, de intimidaciones, amenazas y violaciones de los reglamentos vigentes, sin que ningún obrero se atreva a protestar por temor a las represalias decretadas por Juan Pérez Roa, Víctor Bosch y otros jerarcas de la Unión." Se hace referencia en este artículo a los líderes de la Unión como " 'lobos de la Unión', 'los todopoderosos de la Unión'

violan en forma intolerable los reglamentos, aplicándolos unilateralmente cuando conviene a sus intereses . . . 'los mandones de la Unión' se las arreglan para intimidar, convencer u obligar a los capataces para obtener cesantías, cambios y promociones de los obreros que no les sean incondicionales . . . El miedo, la situación de temor mantenida por 'los mandones de la Unión' no permitió la protesta".

El fundamento de la sexta causa de acción es el Exhibit F, un recorte de información publicada en El Imparcial, edición de 6 de marzo de 1957, sobre un incidente que motivó acusación contra un lider obrero por agredir a un obrero que "demanda la renuncia de la actual directiva de la UTM 'para acabar con la dictadura de Pérez Roa y Víctor Bosch' ". Informa además una acusación héchale a cierta persona "del bando de Pérez Roa y Bosch" por acometimiento y agresión a otro con cuchilla plegadiza.

Los Exhibits G y G(1) dan lugar a la séptima causa de acción. El primero es el titular de El Imparcial de marzo 7 de 1957 que lee: "JUZGAN UNIÓN DE ROA Y BOSCH POR ACTOS ILÍCITOS". El segundo es la información publicada en la misma edición de dicho periódico apuntando que según un tal Alfredo Arroyo, "uno de los 'utemistas' que combaten a Víctor Bosch, Juan Pérez Roa y Pedro Rosa . . . Hablando detalladamente del debatido asunto de la Clínica Biascoechea, cuya alegada compra por parte del Dr. Seín ha sido objeto de numerosos comentarios . . . dijo que los trabajadores esperan de un momento a otro la intervención del FBI para investigar y aclarar el caso."

Se alega como octava causa de acción que en El Imparcial de marzo 8 se publican ciertos informes, marcados Exhibits H, H(1) y H(2), anunciando con titular que "Unión de Roa y Bosch Desiste Actos Ilegales . . ." ; que según un portavoz de otra Unión "no es la primera vez que la UTM hace una estipulación de ese tipo" (comprometiéndose a desistir de cierta práctica) "y después no la respeta . . . la UTM-IBL de Bosch y Pérez Roa, sabiendo que la ILA

tenía suscrito un convenio colectivo con la San Juan Mercantile, empleó coacción y violencia contra los 'ilaístas' para impedir la descarga de tres buques."

El Exhibit H(1) es un editorial publicado en la referida fecha en El Imparcial, al efecto de "la lente de la opinión pública se posa con ceño adusto, sobre determinados líderes sindicales, cuya conducta en la dirección de sus gremios y en la administración de los fondos del pueblo trabajador deja mucho que desear." Hace referencia al estado de corrupción que priva en altas esferas del gremio del Transporte en Estados Unidos. Luego señala que en Puerto Rico "son los propios trabajadores los que acuden al remedio judicial para poner coto a las malas prácticas y tajureos de sus líderes." A renglón seguido se refiere a demanda radicada por obreros ya viejos que "habiendo cotizado durante 16 años al Fondo de Bienestar de la Unión de Trabajadores de Muelles, y encontrándose desvalidos y desempleados en estos momentos, no reciben ninguna de la ayuda a que creen tener derecho de la Unión que presiden Víctor Bosch y Juan Pérez Roa . . . los líderes mencionados declaran que la Unión no lleva ninguna contabilidad de las aportaciones que hacen sus afiliados al Fondo de Bienestar y que no tiene ninguna clase de información acerca de cuántos han sido los ingresos de ese Fondo . . ."

El Exhibit H(2) es el titular de El Imparcial de 8 de marzo que dice: "UNIÓN DE BOSCH Y ROA DESISTE DE ACTOS ILEGALES."

Se alega que los Exhibits I e I(1) sostienen la novena causa de acción. El primero es el recorte de una información publicada en El Imparcial en 12 de marzo de 1957 sobre insultos y provocaciones de varias docenas de trabajadores traídos de la isla y que nada tienen que ver con El Imparcial que, dirigidos por Víctor Bosch, Colón Gordiany e Hipólito Marcano, rodearon el edificio de El Imparcial y "lanzaban insultos y provocaciones . . . Fue de tal naturaleza el escándalo y de tal magnitud el atropello de palabras emplea-

das por ellos que a no ser por la serenidad . . . del personal de El Imparcial, hubiese degenerado en encuentros personales o en un motín de impredecibles consecuencias. . . . Por más de 30 minutos estuvo la turba deshaciéndose en improperios y maledicencias contra los leales empleados de El Imparcial, y luego se agruparon frente a la puerta obstruyendo la entrada del edificio que hubo de ser cerrada para evitar que algunos de los manifestantes que no son de los empleados de El Imparcial que **están en huelga sino de** extracción de otros pueblos de la isla, tratara de penetrar al edificio."

El Exhibit I(1) relaciona dos cartas de felicitación a El Imparcial por un editorial y una que señala que "Pérez Roa y Víctor M. Bosch, quienes no engañarán a nadie porque todos los trabajadores de muelle los conocemos", se retiraron de unas elecciones obreras.

La décima causa de acción se justifica a base del Exhibit J que consiste de un recorte de información publicada en El Imparcial de 12 de marzo de 1957, comentando otra vez sobre la demanda de los 31 obreros por pensiones por vejez y en la cual se informa que estas personas sostienen que tuvieron que demandar "por la actitud que mantienen los dirigentes de la Unión, encabezados por Juan Pérez Roa, quien ha dicho, conforme sostienen los demandantes, que 'en la UTM no hay nada para los viejos' . . . Los demandantes señalan que 'los dirigentes de la UTM apelan ahora al subterfugio de que no llevan cuentas de los dineros que ingresan a esa sindical' y agregan que 'nadie puede creer tal argumento cuando es sabido que los obreros portuarios aportan miles de dólares a los fondos generales de la Unión' . . . 'Si es cierto que los directores de la UTM no llevan cuentas del dinero que ingresa en la Unión cabe preguntar ¿cómo es que se conducen los procedimientos financieros en una sindical tan poderosa como la UTM? . . .' Otros muchos afectados . . . 'no se atreven a levantar la

voz por temor a represalias de la dictadura que mantienen Pérez Roa y sus secuaces en el frente de la UTM' ".

El Exhibit K que sirve de base para la undécima causa de acción es una información publicada en El Imparcial en 15 de marzo de 1957, a los efectos de que ciertos miembros "de la Unión que dirigen Juan Pérez Roa y los licenciados Víctor Bosch y Francisco Colón Gordiany, convertidos en bandoleros, apedrearon salvajemente el automóvil" de un empleado de El Imparcial. Se une a esta información una fotografía de Víctor Bosch, designándosele "Consejero Legal".

La duodécima causa de acción se ancla en los Exhibits L, L(1) y L(2) que son recortes de informaciones publicadas en El Imparcial de 16 de marzo de 1957. El Exhibit L se refiere a manifestaciones de Ramón Ojeda, bajo titular "Esperan Meany y Bradley Vengan a Acabar Abusos del Liderato de UTM-IBL", de que tales señores expliquen "acerca de 'la historia y récord de cada uno de los líderes que actualmente están viviendo del sudor de los trabajadores de muelles . . .' que ninguno de los cacareadores líderes de la UTM-IBL ha hecho nada por los trabajadores de muelles. Se refiere sin duda a Víctor Bosch y a Juan Pérez Roa. 'Lo único que han hecho ha sido dividir a las uniones y hacer que unos a otros nos maltratemos mientras ellas siguen a sus anchas' . . . Además de las duras y amargas realidades acerca de la política abusiva puesta en práctica por el actual liderato de la UTM-IBL encabezado por Víctor Bosch, Pérez Roa y Colón Gordiany . . ."

El Exhibit L(1) relata un incidente con respecto a un telegrama que el recurrente dirigió al Sr. Ayuso pidiéndole fecha, hora y precio para uso de tiempo de la WITA para contestar su discurso y que nunca se contestó. El Imparcial niega que se recibiera tal telegrama pero admite que la emisora WITA recibió un telegrama como ése.

El Exhibit L(2) indica que dos individuos que atacaron a pedradas al automóvil de un empleado de El Imparcial fueron acusados de daños maliciosos, señalando que los dos

individuos son miembros de la Unión que dirigen Juan Pérez Roa y los licenciados Víctor Bosch y Francisco Colón Gordiany.

La causa de acción decimotercera descansa en el relato contenido en el Exhibit M, publicado en El Imparcial en 18 de marzo de 1957, informando de un ataque con cuchilla a un empleado de El Imparcial que recibió heridas en un brazo y en la espalda, perpetrado por un tal Alberto Pérez Pérez "vice presidente de la Hermandad de Trabajadores de Artes Gráficas y Ramas Anexas cuyos consejeros y asesores son Víctor Bosch y Colón Gordiany."

El editorial en El Imparcial de 19 de marzo de 1957, marcado Exhibit N(1), y otra información publicada en dicho periódico ese mismo día, marcado Exhibit N(2), motivan la causa de acción decimocuarta. El editorial en cuestión informa que "por otro lado sigue funcionando el puñal artero contra nuestros leales empleados, en agresión tras agresión, inspiradas por el 'elemento criminal, antisocial y perturbador, que amenaza con la violencia y la ejercita libremente como aquéllos que en Nueva York, no hace mucho, pagaron asaltadores para que arrojaran ácido nítrico a los ojos de un periodista dejándolo ciego para toda la vida, porque denunció desde las columnas del periódico a los raqueteros que han hecho de las uniones obreras guaridas de bandidos, explotadores sin conciencia de obreros y patronos, en vez de agencias de progreso social y económico . . . ' " Unido a este editorial aparece una caricatura titulada "EL TRÍO DEL AGARRE" uno de los cuales se designa Víctor Bosch, portando un cartelón que lee: "Amigos Huelguistas: Aquí venimos a darle aliento. ¡Lo único que les podemos ofrecer! Porque de Aquello . . . ¡NADA! 'Nuestra amistad ha de ser a condición de que lo mío sea mío, y lo tuyo de los dos' ". El Exhibit N(2) es una fotografía de Alberto Pérez, a quien se hizo referencia en el Exhibit M, poco después de salir bajo fianza por haber intentado de matar a cuchilladas a un chófer de El Imparcial. Vuelve a hacerse referencia en esta

información a que el tal Pérez es "vice presidente de la Hermandad de los Trabajadores de las Artes Gráficas y Ramas Anexas . . ." que asesoran Víctor Bosch y Colón Gordiany.

La décimoquinta causa de acción se ampara en los Exhibits O (1) y O (2). El Exhibit O (1) consiste de la reproducción de la caricatura del Exhibit N (1) (Trío del Agarre) unida a una información sobre acusación de malversación de $322,000 del gremio de Chóferes de Camiones, contra su presidente Dave Beck, y otra contra su vicepresidente James R. Hoffa por obstaculizar la investigación senatorial. Al calce de la caricatura se indica que se reproduce a solicitud de amigos y se dice: "la cual cobra aún más actualidad en los momentos en que altas direcciones sindicales descarriadas se encuentran bajo la lente escrutadora de la opinión pública."

La decimosexta y última causa de acción alega que según el Exhibit P publicado en El Imparcial en marzo 13, 1957, dos individuos, "con otros agitadores profesionales, entre los que estaban Víctor Bosch, Colón Gordiany y Marcano, dirigieron a las decenas de obreros que en la mañana del domingo . . . llegaron frente al edificio de EL IMPARCIAL y por más de 30 minutos estuvieron vociferando frases deshonestas, ataques viciosos y provocaciones a los empleados de este diario." Añade esta información al final lo siguiente: "N.R. Denunciaron y arrestaron al agente provocador, Chú Castro Molina, pero los elusivos jefes de la ganga que provocaba, Bosch, Colón Gordiany y el masón Hipólito Marcano, se excusaron y salieron por el foro. Y el teniente Alvarado los perdonó."

En cada causa de acción se alega que como consecuencia de los hechos alegados el demandante ha sufrido daños ascendentes a $3,000.00.

La demanda luego incluye, como alegaciones comunes a todas las causas de acción, las siguienes:

"Mediante las informaciones a que se hace referencia en las causas de acción expuestas en la presente acción civil los demandados han publicado, vendido y circulado en EL IMPARCIAL con malicia y mala fe, repetida, continuada e insistentemente durante las fechas antes indicadas, una serie de acusaciones falsas y calumniosas, tildando al demandante de 'raquetero', vocablo que conlleva la acepción usual y corriente de pillo y ladrón; imputando al demandante actuaciones personales de carácter moral altamente censurables; imputándole además contubernio con los patronos para traicionar y entregar a sus representados y clientes; imputándole mal uso de dineros bajo su custodia como síndico del Fondo de Bienestar de los Trabajadores de Muelles; implicando y sugiriendo malversación de los depósitos en dicho Fondo para provecho propio; acusando al demandante de dirigir gangas de terroristas mediante la ejecución de actos de violencia y de pavor; imputándole al demandante ser condueño de la Clínica Dr. Seín, entidad ésta que presta servicios bajo contrato al Fondo de Bienestar que el demandante representa como síndico e imputando además que por esa condición de síndico el demandante recibe un beneficio económico ilegítimo, medrando como lider obrero mediante la explotación y el engaño a los trabajadores.

"Utilizando EL IMPARCIAL como empresa comercial de publicidad, promoción y propaganda, y en represalia y venganza por la huelga decretada en su contra por el personal tipográfico, con malicia, mala fe y a sabiendas de sus falsedades e informaciones tendenciosas, los demandados han hecho las imputaciones y acusaciones que antes se transcriben, en una publicación no privilegiada, con el deliberado y preconcebido propósito de exponer al demandante al odio, desprecio y ridículo del pueblo y de privarle del beneficio de la confianza pública y del trato social."

En oposición a esta demanda, los recurridos presentaron moción de desestimación por el fundamento de que la demanda, ni ninguna de las varias causas de acción que la constituyen, contiene hechos suficientes para constituir causa de acción en contra de los recurridos. El tribunal de instancia declaró con lugar dicha moción y, al negarse el recurrente a enmendar su demanda, dictó sentencia en 13 de octubre de 1959 declarando sin lugar la demanda, con

costas, sin incluir honorarios de abogado. La extensa resolución del tribunal de instancia dictamina que de su faz resulta que las aludidas comunicaciones no son libelosas respecto del demandante aunque pudieran serlo respecto de otras personas en ellas aludidas; que por ser su lenguaje directo y claro no son susceptibles de aclaración por innuendo que pudiera convertirlas en libelosas *per se;* y que las comunicaciones, en cuanto concierne al recurrente, son privilegiadas primero porque consisten de informes de interés público que El Imparcial tiene el deber de suministrar a sus lectores; segundo, porque las mismas no contienen comentario ni información respecto al demandante que pueda considerarse injusto (*unfair*) o que implique malicia legal; y tercero, el recurrido, por ser un lider obrero de una unión en huelga con El Imparcial había abandonado su condición de ciudadano privado y había sometido su persona, sus actos y sus ejecutorias al examen crítico consiguiente. Por último, dictamina la referida resolución que de los términos de las publicaciones mismas, en cuanto aluden al demandante, no resulta malicia legal, que la alegación de malicia expresa, por sí sola, no basta para sostener la demanda; debiendo, además, en tal caso alegarse en la forma específica que determina la ley, daños especiales, lo que no se hace en la demanda.

En su petición de revisión, el recurrente alegó que el tribunal de instancia cometió tres errores, a saber:

"I. Error de determinar que de la faz de las comunicaciones publicadas en el periódico El Imparcial, según se exponen en la demanda, 'no resulta que las mismas sean libelosas respecto al demandante, aunque pudieran serlo respecto de otras personas en ellas aludidas' ".

"II. Error de resolver que 'de los términos de las publicaciones del periódico El Imparcial', conforme a lo señalado en la demanda, 'no resulta malicia legal y por consiguiente las mismas no son enjuiciables per se', debiendo alegarse daños específicos".

"III. ERROR AL CONCLUIR QUE 'DE LOS TÉRMINOS DE LAS COMUNICACIONES OBJETADAS Y POR TANTO DE LA FAZ DE LA DEMANDA, RESULTA, QUE EN CUANTO CONCIERNE AL DEMANDANTE, DICHAS COMUNICACIONES SON PRIVILEGIADAS' ".

1. La acción civil de daños y perjuicios ocasionados por libelo y calumnia se estableció en Puerto Rico por la Ley de febrero 19 de 1902, 32 L.P.R.A. secs. 3141–3149. Dicha ley define el libelo en la siguiente forma:

"Sec. 2. Se entiende por libelo la difamación maliciosa que públicamente se hace en contra de una persona por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, o cualquiera difamación maliciosa publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar los parientes y amigos sobrevivientes."

La jurisprudencia ha distinguido entre publicaciones que son libelosas *per se* y aquéllas que por no serlo de su faz se designan libelosas *per quod*. La publicación que imputa la comisión de un delito se considera libelosa *per se* y por lo tanto no exige alegación ni prueba especial de daños. *Pueblo* v. *Prensa Insular*, 69 D.P.R. 683 (1949); *Rivera* v. *Martínez*, 26 D.P.R. 760 (1918). La publicación de denuncia jurada contra un abogado acusándolo de falsa representación e impostura constituye un libelo *per se*. *Benet* v. *Hernández*, 22 D.P.R. 494 (1915). La imputación no tiene que ser necesariamente de un delito. Es suficiente que tienda a desacreditar, menospreciar o deshonrar o a exponer la persona al odio del pueblo o a su desprecio, o a privarle de la confianza pública y trato social, o a perjudicarle en sus negocios. Imputar a un abogado que es "chanchullero" en relación con un asunto en que actuó como notario constituye libelo *per se*. *Forés* v. *Balzac*, 29 D.P.R. 222 (1921). En *Maidman* v. *Jewish Publications, Inc.*, 355 P.2d 265 (Cal.

1960), el artículo acusaba a un prominente lider en asuntos religiosos de no ser merecedor de su alta posición, de conocer su religión menos que un niño adolescente, de hacer que los miembros de su religión aparezcan ridículos. La demanda se desestimó por moción. Se revocó luego por constituir libelo *per se*, y no comentario imparcial, pues expuso a Maidman al desprecio y ridículo de otros miembros de su religión. En *Brown* v. *Du Frey*, 134 N.E.2d 469 (N.Y. 1956), se trataba de un artículo en un periódico informando que una señora desheredó a su esposo en un testamento en el que declaró que lo hizo intencionalmente "porque durante mi vida me abandonó, no proveyó para mi sostenimiento, me trató con absoluta indiferencia y no me brindó afecto o consideración alguna". El marido declaró que esto era falso. No hubo prueba en contrario. La corte resolvió que tal artículo era libeloso *per se*, que expuso al marido al odio del pueblo y que tendía a crear una opinión mala de él en la mente de personas de buen entendimiento y a privarle de su concurso amistoso a la sociedad. En *Muchnick* v. *Post Publishing Co.*, 125 N.E.2d 137 (Mass. 1955) se trataba de un editorial imputándole al demandante que dirigía reuniones del Comité Escolar de Boston en forma desordenada y que se conducía en forma insultante y vergonzosa y actuaba en su propio interés. La corte concluyó que estas alegaciones eran suficientes para aducir una causa de acción, más aun cuando se alegó que la publicación se hizo con malicia. En *Murphy* v. *Farmers Educational & Cooperative Union*, 72 N.W.2d 636 (N.D. 1955) un artículo informaba que a un funcionario del Estado se le pagaban cuantiosas cuentas de gastos por solicitar fondos para una Asociación voluntaria y que promovía los intereses de corporaciones grandes en perjuicio de ganaderos pequeños. Se denegó una excepción previa en este caso por considerarse que dicho artículo era libeloso *per se*. En *Jeffers* v. *Screen Extras Guild*, 237 P.2d 51 (Cal. 1951) se encontró libelosa *per se* la información contenida en una carta circulada como noticia a miem-

bros de una unión acusando al demandante de ser un demagogo y un dictador en su carácter de lider de la Unión, que velaba por sus ambiciones a expensas de los miembros de la Unión, de permitir taller abierto, de asociarse con una unión influida por el comunismo, de usar una gacetilla escandalosa y despreciable y una sucia lista negra para tratar de destruir la Unión. Sin embargo, en 328 P.2d 1030 (Cal. 1958), luego se resolvió en este caso que dicha carta no era libelosa por circularse dentro de las filas de una unión durante una disputa entre facciones contendientes sobre política gremial. En *Dethlefsen* v. *Stull*, 195 P.2d 56 (Cal. 1948), se consideró libelosa *per se* una comunicación escrita por el demandado a los clientes de una sociedad disuelta de la que era socio, informando que "Entre otras cosas, un examen de los libros demuestra que, durante un período de meses, el demandante recibió dinero de la firma en la cantidad de unos $1,400 que dejó de depositar en la cuenta de la firma" a pesar de que tal información no imputaba la comisión de un delito. Se citaron en la opinión los casos de *Jimeno* v. *Commonwealth Home Builders*, 191 P. 64 (Cal. 1920), en el cual se consideró libelosa *per se* la imputación falsa de violación de confidencia o la de traición a sus asociados, y el de *Tonini* v. *Cevasco*, 46 P. 103 (Cal. 1896), en que también se consideró libelosa *per se* una declaración de que el demandado había despedido al demandante por conducta reprensible. En *Rooney* v. *Feinstein*, 76 N.Y.S.2d 77 (1947), se trataba de un superintendente de caminos, un capataz de asfaltado y un mecánico del condado—funcionarios públicos—de quienes se informaba en un artículo que las relaciones de amistad y la eficiencia de la Oficina del Presidente del Condado de Queens se retardaban por la actitud arbitraria y caprichosa de aquéllos, contra los intereses de la Unión Queens Local 107 AFL; que los empleados de dicha oficina no tolerarían el atentado de tales subordinados de destruir la Unión mediante amenazas, intimidación, etc.; que ególatras, y otros que buscaban ventaja

personal a expensas del grupo y aquéllos que buscaban el favor político sin la acción política adecuada no estaban en condiciones de gestionar acción alguna de parte de funcionarios electos. Se determinó que existía causa de acción por libelo pues cualquier acusación falsa que deshonre o desacredite a un hombre en la estimación del público o sus amigos o conocidos o tiene una tendencia razonable a lograrlo, o que perjudique su reputación y por lo tanto lo exponga al odio público, al desprecio, desdén o a la deshonra, es libelosa. En *Thackrey* v. *Patterson*, 157 F.2d 614 (1946), el demandado publicó que la esposa demandante había comprado a su esposo demandante con dinero; que estaba desencantado con él como editor y lo consideraba inadecuado como marido; que en ambas capacidades su deseo era por un hombre diferente . . . Se determinó que tal publicación constituye un libelo *per se* y es innecesario alegar daño especial. Por el contrario, en *Fajardo* v. *Sabater*, 20 D.P.R. 39 (1914), se resolvió que una carta destituyendo a un empleado municipal por formular una demanda contra el alcalde que lo destituye, basada en hechos falsos, y manifestando que esta acción establecería un precedente impropio, funesto e incorrecto, no constituye libelo en ausencia del necesario innuendo, esto es, la significación libelosa que el demandante da a dichas frases. En *Perea* v. *Gómez Hnos.*, 21 D.P.R. 26 (1914), se determinó que la publicación de un rumor de que el Gobernador le ha pedido la renuncia al alcalde y al día siguiente, la publicación de que "no se quiere que el alcalde renuncie, su fracaso e ineptitud seguirá" no constituye libelo *per se* cometido por un periódico; para constituir causa de acción había que alegar otro elemento o elementos, que era perjudicial y sin motivo que lo justificase, y además debió alegarse perjuicio determinado. En *Moraza* v. *Rexach Sporting Corp.*, 68 D.P.R. 468 (1948), se resolvió que el uso del epíteto "pillo" no se empleó literalmente para imputar la comisión de un delito pero que la frase se profirió en sentido figurado como una mera expresión de abuso en un

arrebato de exaltación y pasión. Cuando el libelo no surge de la faz de la publicación sino de hechos que no son aparentes de la faz de la misma, o sea en casos de libelo *per quod*, el demandante viene obligado a alegar tales hechos y probarlos por medio de lo que se designa como el "estímulo" (*inducement*). También tiene que establecer el carácter difamatorio de la publicación con referencia a tales hechos, o sea el "innuendo". Si la publicación no hace referencia al demandante, éste debe alegar y probar, por vía de "*colloquium*" que el significado difamatorio se refiere a él. Prosser, *On Torts*, 2da. edición, pp. 582–583. En los casos de libelo, contrario a los de calumnia, la regla original era que la acción procedía, sin tener que alegar daños específicos. Esta es aún la regla en una minoría de las jurisdicciones estadounidenses, tanto en casos de libelo *per se* como en aquéllos de libelo *per quod* y se adoptó como la regla en el *Restatement of Torts*, sec. 569. Véase Prosser, *supra*, p. 587. El caso de *Perea*, supra, parece indicar que este Tribunal ha establecido la regla adoptada por la mayoría de las cortes estadounidenses de que cuando el libelo no es aparente de la faz de la publicación, no es base para acción, a menos que se prueben daños específicos.

El que publica un libelo realizado por otro es a su vez responsable por tal libelo. *Davis* v. *Macon Telegraph Publishing Co.*, 92 S.E.2d 619 (Ga. 1956). En *Pueblo* v. *Prensa Insular*, 69 D.P.R. 683 (1949), se determinó que una caricatura junto con un escrito constituyó el libelo *per se* en ese caso.

■ 2. Aunque el libelo sea aparente de la faz de la información, la publicación de ésta puede que no dé base para una acción de libelo por ser la publicación privilegiada de acuerdo con las Secs. 4 y 5 de nuestra ley sobre libelo y calumnia. 32 L.P.R.A. secs. 3144–3145.([1]) Es necesario

---

([1]) "Sec. 4. No se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. No se presumirá que es maliciosa la publicación que se hace:

señalar que esta defensa de privilegio es más restrictiva en Puerto Rico que en otras jurisdicciones que han adoptado la regla de la ley común. En el caso de *Díaz* v. *P.R. Ry. Lt. & P. Co.*, 63 D.P.R. 808 (1944), este Tribunal estableció el principio que esta cuestión de privilegio es puramente estatutaria.

A menos que el privilegio surja de la faz de la demanda, como por ejemplo cuando se alega en la demanda que el libelo consiste en la publicación fiel y exacta de un procedimiento judicial, en cuyo caso debe prosperar una moción para desestimarla, la regla es que la defensa de privilegio no se puede alegar por vía de moción para desestimar o por excepción previa. *Foltz* v. *Moore McCormack Lines*, 189 F.2d 537 (C.C.A. 8, 1951); *Carr* v. *Watkins*, 177 A.2d 841 (Md. 1962); *Sullivan* v. *Republican Publishing Company*, 177 N.E.2d 774 (Mass. 1961); *Murphy* v. *Farmers Educational & Cooperative Union*, supra; *International Dial Co. Inc., et al.* v. *Group et al.*, 82 N.Y.S.2d 25 (1948); *Rooney* v. *Feinstein*, supra; *Roethke* v. *North Dakota Taxpayers Ass'n*, 10 N.W.2d 738 (N.D. 1943); 51 A.L.R.2d 554; Yankwich, *The Protection of Newspaper Comment on Public Men and Public Matters*, 11 La. L. Rev. 327, 343 (1951). Sin embargo, por virtud de la Regla Núm. 10 de las Reglas de Procedimiento Civil en vigor en esta jurisdicción, aun en el caso que los hechos y circunstancias del privilegio no aparecieren de la faz de la demanda, tal vez podría prosperar la referida moción bajo el inciso 2 o el inciso 3 de dicha regla,

"Primero: En el propio desempeño de un cargo oficial;

"Segundo: En informe justo y verdadero, de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos;

"Tercero: A un funcionario oficial, apoyada en causa probable, con la intención de servir al procomún, o de conseguir remedio a un perjuicio hecho a un particular."

"Sec. 5. Se presumirá que existe malicia en cualquier comunicación o escrito infamatorio o calumnioso que se dirija a otra persona que no sea un pariente dentro del tercer grado, o a una persona a quien el autor tenga bajo su tutela, o cuando dicha comunicación se cruce entre personas que tengan negocios en sociedad, u otra asociación semejante."

siempre y cuando tales hechos y circunstancias se expusieren en la moción y se cumpliese con las demás disposiciones aplicables de la referida regla.

Examinemos ahora el caso de *Caraballo* v. *P. R. Ilustrado, Inc.*, 70 D.P.R. 283 (1949), citado en la resolución del tribunal de instancia en apoyo de algunas de sus conclusiones. De acuerdo con los hechos de este caso, El Mundo publicó una información sobre una acusación radicada ante una corte municipal por supuestos delitos de falsa representación e impostura por la que se acusaba a Pérez de tratar de cambiar un billete de un dólar dividido en dos en un banco y a Caraballo de habérselo entregado a Pérez. Se añadió que en San Juan un individuo pagó su pasaje en guagua con un billete al cual había despegado el reverso y luego pagó a un chófer con el anverso y que se desconoce si los individuos arrestados tienen conexión con estos casos. Se alegó en defensa que la publicación era privilegiada. El carácter libeloso del artículo se dio por admitido. Se alegó que el artículo no era copia fiel de la fuente de información que alegan los demandados les sirvió de base, sino que fue adulterada y, además, se añadió un párrafo final insinuando que el demandante estaba conectado con delitos de igual naturaleza en San Juan. Se dictaminó que un periódico disfruta de privilegio al publicar el contenido de los asientos en el Libro de Novedades sujeto a que sea una relación clara y verídica del contenido—la información se encontró que era una relación bastante fiel y exacta del asiento. La adición al final no mencionó a Caraballo. Dijo esta Corte: "El periódico, como informador público tenía derecho a hacer comentarios razonables, verídicos y exactos respecto a la noticia que daba"—lo eran excepto que se refirió a los "arrestados" cuando en realidad el demandante no lo fue— "el periódico tenía derecho a inferir lógicamente que éste había sido arrestado."

■ 3. Por último, nos resta analizar brevemente la regla concerniente a la defensa del comentario imparcial

que se invoca en la resolución del tribunal de instancia como fundamento para desestimar la demanda en este caso. Dice Prosser que por ser de interés general lo que ocurre con respecto a asuntos públicos, se reconoce un privilegio restringido bajo el cual un periódico o cualquier otra persona puede informar sobre el asunto al público. La información debe ser imparcial y exacta. El privilegio no cubre el informe falso de los hechos, la inclusión de materia difamatoria o un informe parcializado. Se pierde este privilegio cuando se publica "maliciosamente" o sea, cuando la publicación no se lleva a cabo con el fin primordial de promover el interés que amerita protección. Si el demandado *actúa movido por animosidad* o para realizar un objetivo que no es legítimo de por sí, como por ejemplo aumentar la circulación del periódico, no obtiene inmunidad. El peso de la prueba recae sobre el demandado en primera instancia de probar la existencia de una ocasión privilegiada para la publicación mediante prueba de un reconocido interés público o privado que justifique la publicación. Establecido el privilegio el peso recae sobre el demandante de probar que se ha abusado del mismo mediante publicación excesiva o mediante el uso de la ocasión para un propósito impropio. Prosser, *On Torts*, 2da. ed., pp. 623–629. La designación del comentario imparcial como un privilegio se presta a confusión especialmente en una jurisdicción como la nuestra donde se ha resuelto que la única fuente de publicación privilegiada es estatutaria. Lo cierto es que la defensa del comentario imparcial proviene del derecho constitucional de libertad de palabra y de prensa limitado por el derecho de toda persona a protección contra ataques abusivos a su honra, reputación y a su vida privada o familiar. Secs. 4 y 8, Art. II, Constitución de Puerto Rico. (1 L.P.R.A. pp. 187 y 189.) Difiere, por lo tanto, de la defensa de privilegio, pues puede invocarse por cualquier individuo, periódico o revista y puede usarse siempre y cuando que el comentario esté basado en hechos de interés

público. La diferencia se expresa con mayor claridad en el caso de *O'Regan* v. *Schermerhorn*, 50 A.2d 10 (N.J. 1946) en la siguiente forma:

"Preliminarmente debe notarse que la defensa de comentario imparcial y bona fide con respecto a la crítica de asuntos de interés público y la defensa de privilegio no son idénticas —son separadas y distintas. En este último caso, las palabras pueden ser difamatorias, pero la difamación es permisible, por razón de la ocasión especial, basado en la política pública, pero en el caso anterior, el comentario y crítica no están privilegiados por razón de la ocasión en un sentido estrictamente legal. Lo que realmente se quiere decir es que tal comentario y crítica, si es imparcial, hecho de buena fe y basado en hechos, no constituye una difamación del demandante y por lo tanto no es libeloso—la censura o crítica no es sobre la persona en sí, sino sobre su obra."

■ Para que el comentario imparcial sea válido y legalmente aceptable debe poseer, según Thayer, las siguientes propiedades:

(a) El comentario debe constituir una evaluación intelectual

(b) El comentario debe estar basado en hechos o en aquéllo que se considere por una persona razonable normalmente como hechos

(c) El comentario debe estar libre de cualquier imputación de motivos sórdidos o corruptos

(d) El comentario debe ser el resultado de una opinión honrada

(e) El comentario debe estar libre de malicia

(f) El comentario debe ser con respecto a un asunto de interés público. Thayer, *Legal Control of the Press* (1956), pp. 397–404.

■ Expresado en forma negativa, los elementos de imparcialidad no están presentes cuando (1) la publicación incluye ataques a los motivos y al carácter de la persona, no relacionados con asuntos a que se refiere el comentario o crítica, (2) discute su vida privada en relación con asuntos

no relacionados con el trabajo o actividad motivo de la crítica y (3) se acusa de un crimen o sea usan epítetos denigrantes o insultantes que no son necesarios para caracterizar su falta de idoneidad o su falta del cumplimiento de su deber. Yankwich, *The Protection of Newspaper Comment on Public Men and Public Matters*, 11 La. L. Rev. 327 (1951).

El comentario puede ser severo y cáustico y aun consistir en una censura rigurosa e implacable siempre que esté basado en hechos o en tales inferencias de los hechos que a juicio de una persona razonable constituya una evaluación justa de una situación. Pero debe distinguirse entre la crítica ruda que puede causar molestia y desconcierto y la manifestación de un acto de criminalidad o conducta vergonzosa sin fundamento. La crítica debe ser pertinente y no un medio de escudar una invectiva o imputaciones personales que no surgen de los hechos del asunto en que se basa la crítica. En disputas obreras, la Corte Suprema de California, interpretando un estatuto sobre líbelo similar al de Puerto Rico, ha sostenido como comentario justo un artículo en un periódico de una unión imputándole a un patrono el llevar a cabo una norma obrera destructiva al violar su convenio(²) así como una carta circular de una unión informando a posibles clientes de un taller de encuadernación que su escala de pago es menor que la de la unión y que sus cotizaciones no se basan en su equipo, calidad y servicio.(³) Pero en *Washer* v. *Bank of America*, 136 P.2d 297 (Cal. 1943) dicha Corte sostuvo una demanda de líbelo consistente en una nota a la prensa del demandado, al margen de una orden de la Junta Nacional de Relaciones Obreras ordenándole reinstalar al demandante, que le imputaba a éste haber falseado su cuenta de gastos, que ha sido culpable de insubordinación flagrante y que ha llamado a los habitantes de la comunidad "patanes" y "campesinos patanes" y ha designado a la ciudad como

(²) *Emde* v. *San Joaquín County, etc.*, 143 P.2d 20 (Cal. 1943).
(³) *Smith* v. *Los Angeles Bookbinders Union*, 284 P.2d 194 (Cal. 1955).

"Siberia". Aunque el demandante reconoció que el comentario se hizo en una ocasión condicionalmente privilegiada, alegó que se hizo con malicia para perjudicar y difamar al demandante e interferir con su habilidad de conseguir empleo y con conocimiento de su falsedad y sin causa probable de o causa para creer en su veracidad. El caso luego se resolvió en sus méritos a favor del demandado por haberse probado la veracidad de las imputaciones y por no ser libelosas ya que meramente constituía una información en oposición a la resolución de la Junta y la razón por que el banco creía que no debía reinstalarse al demandante. Véase Gilbert, *Privileged Publication in Labor Disputes under California Libel Laws*, 30 So. Cal. L. Rev. 35 (1956). Es de notarse que la publicación en este caso es privilegiada bajo la Sec. 47 del Código Civil de California, lo que no es así en Puerto Rico, de manera que la corte sostuvo que, no obstante ser la publicación libelosa *per se*, había que alegar y luego probar que se hizo maliciosamente para poder vencer la defensa de privilegio, no habiéndose logrado esto último.(4)

4. Los recurridos citan en apoyo de su contención de que las publicaciones en este caso constituyen comentario imparcial el caso de *Broking* v. *Phoenix Newspapers*, 264 P.2d 413 (Ariz. 1953), en que se resolvió que publicar una fotografía de un perro muerto encadenado a un poste con el comentario de que el perro, el mejor amigo del hombre, murió de calor, sed y hambre y que los vecinos culpaban a su dueño mientras que los funcionarios lo buscaban, jurando que lo procesarían hasta donde más pudieran por la cosa tan terrible que habían realizado, constituía libelo *per se*. Sin embargo, se resolvió que al resolver la corte de instancia en ese caso que la publicación era restringidamente privile-

---

(4) El Art. 47 del Código Civil de California en su parte pertinente dispone: "Una publicación o radio emisión privilegiada es una que se hace . . . 5. Mediante un informe imparcial y correcto de (1) los procedimientos de una reunión pública . . . (2) la publicación del asunto que motiva la queja se hace para beneficio del público."

giada el peso pasó al demandante para demostrar no tan sólo malicia expresa sino también la falsedad de la comunicación. Este caso es singular, pues la corte concluyó que la publicación era libelosa *per se* y sin embargo resolvió que gozaba de privilegio por ser de interés público comunicada por una entidad con derecho a informar al público sobre el asunto. Añadió la corte que tan pronto como se resuelve que la publicación es comentario imparcial o privilegiada el peso pasa al demandante de probar tanto la falsedad de la publicación como que el demandado actuó de hecho maliciosamente. Creemos que la mejor regla y la más lógica es la del caso de *O'Regan*, supra, en cuanto a la naturaleza del comentario imparcial—o sea, que si la publicación es libelosa, por lo general no constituye al mismo tiempo un comentario imparcial y si es esto último, no debe ser libelosa. La defensa de privilegio va más bien dirigida a excusar, a privar al perjudicado de una causa de acción con respecto a lo que en derecho es libeloso.

También citan los recurridos el caso de *Kinsley* v. *Herald & Globe Ass'n*, 34 A.2d 99 (Vt. 1943). En este caso se trataba de un artículo publicado en un periódico bajo el título "Una trapaza (*racket*) legal", en que se relacionaba que un individuo y su mujer habían recibido $12,800 por daños sufridos en un accidente de automóvil en un carro conducido por su hijo, en un caso radicado contra el hijo. Añadía el artículo que "Dejemos a la imaginación de nuestros lectores adivinar quién paga la cuenta en este agradable asunto de familia." Se alegó como defensa que el asunto objeto de la publicación era de importancia e interés a todos los residentes del territorio donde circula el periódico y al público en general; que el artículo era una relación fiel y exacta de los hechos y el balance constituía comentario imparcial y razonable y una crítica de un asunto de interés público; que el demandado no actuó con malicia o con intención de perjudicar al demandante pero sólo con el deseo de llamar la atención del público a un asunto de gran interés público. El deman-

dante radicó una excepción previa a esta defensa.(5)   La
corte resolvió que el lenguaje del artículo constituía un líbelo
*per se* y que procedía declarar, como declaró, con lugar la
excepción previa a la referida defensa.   Aunque asuntos de
interés público son objetos legítimos de crítica y todo el
mundo tiene derecho a comentarlos siempre que se haga con
imparcialidad y con un propósito honrado, la corte en este
caso resolvió que los hechos del caso no justificaban un
comentario que reflejase sobre el demandante personalmente
y que pudiere ennegrecer su reputación.   También citan el
caso de *Bailey* v. *Charleston Mail Ass'n*, 27 S.E.2d 837
(W.Va. 1943), con el mismo propósito, o sea para sostener
la contención de que las publicaciones objetadas en este caso
constituyen un comentario imparcial de un asunto de inte-
rés público.   En dicho caso se basó la acción de líbelo en
un editorial de un periódico que informaba los numerosos
escándalos de la administración Neely del Estado de West
Virginia en relación con la compra de un puente de poca
valía y a esos efectos en vez del demandante a nombre del
Estado comprarlo directamente lo hizo a través de un agente
quien, primero adquirió una opción por $990,000 y luego lo
vendió al Estado por $1,040,000, "una limpiada nítida de
$50,000."   Luego se emitieron bonos a nombre del Estado
para pagar el puente—"aquí había una posibilidad segura
de más 'salsa' que ningún político astuto de la calaña de
Neely podía dejar pasar".   El valor de su faz de los bonos
era $1,040,000, pero se vendieron en venta privada (no se
permitió subasta) a una casa financiera "de nuestro viejo
amigo el político del condado de Cabell."   "Habrá alguien
que sepa cuál fue la tajada del caballero de Cabell en esta
transacción—nosotros lo ignoramos."   El demandante no era
Neely ni el político del condado de Cabell.   Se alegó que el
lenguaje insinuaba que el demandante había robado o hecho
mal uso del dinero o bienes del Estado de West Virginia;

---

(5) O sea, el equivalente de una moción para eliminar o desestimar.

que actuó corruptamente en relación con la compra del puente; y que fue negligente e incompetente en el cumplimiento de su deber. En defensa se alegó privilegio y comentario imparcial. El demandante excepcionó esta defensa y al declararse sin lugar la excepción apeló. La referida defensa alegó la veracidad de los hechos y que el balance constituye comentario imparcial con respecto a los mismos sin propósito de causarle daño al demandante, de buena fe sobre un asunto de interés público. La corte resolvió que asumiendo que los hechos alegados en la defensa son ciertos, los comentarios no son tan violentos o expresados en forma intemperante al extremo de trascender el derecho del comentario imparcial *hecho sobre la base de la verdad.* La corte encontró que los hechos aducidos eran suficientes para sostener las inferencias publicadas por los demandados así como los comentarios. No tan sólo es este caso claramente distinguible del que nos ocupa, en cuanto a los extremos del comentario y crítica objetados, sino que la propia corte admite que la mayoría de las cortes en Estados Unidos han resuelto que la publicación de una información falsa con respecto a la conducta oficial de un funcionario público no es privilegiada. También se apoyan los recurridos en el caso de *New York & Porto Rico SS. Co.* v. *García,* 16 F.2d 734 (C.C.A. 1, 1926). Pero ya esta corte resolvió en el caso de *Díaz,* supra, a la página 818, que "esta opinión [o sea la del caso de Díaz] y no la emitida por la Corte de Circuito de Apelaciones en el caso de *New York & Porto Rico SS. Co.,* expone la ley local sobre la cuestión de privilegio restringido bajo nuestro estatuto local."

En resumen: (1) Una publicación es libelosa *per se* no tan sólo cuando imputa la comisión de un delito sino también cuando tiende a desacreditar, menospreciar, o deshonrar o a exponer a una persona al odio del pueblo o a su desprecio o a privarle de la confianza pública o trato social o a perjudicarle en sus negocios. En estos casos no hay que hacer alegación especial de daños. (2) El que

publica un libelo realizado por otro es a su vez responsable por tal libelo. (3) Aunque el libelo sea aparente de la faz de la publicación ésta puede que no dé base para una acción de libelo por ser privilegiada de acuerdo con las Secs. 4 y 5 de nuestra ley sobre libelo y calumnia. (4) La defensa de privilegio no puede alegarse mediante moción para desestimar la demanda, a menos que el privilegio surja de la faz de la demanda como sería el caso del privilegio absoluto de la publicación fiel y exacta de un procedimiento judicial. (5) La defensa de comentario imparcial no es materia de privilegio—es decir que, cuando un comentario o crítica es imparcial, hecho de buena fe, basado en hechos y con respecto a un asunto de interés público, no constituye difamación aunque sea severo y cáustico.

Expuesto en forma lo más breve posible el derecho sobre la compleja materia del libelo, procedemos ahora a la aún más difícil tarea de aplicarlo al caso ante nos.

La demanda, dentro del marco de una situación de huelga existente entre la unión de la cual el recurrente es un alto funcionario y la empresa recurrida, expone 16 causas de libelo, alegándose en cuanto a todas la mala fe y malicia de los recurridos, el propósito de represalia o venganza por la huelga, y el conocimiento de que las informaciones son falsas y tendenciosas. La demanda no alega daños específicos sino la cuantía de $3,000 de daños en relación con cada una de las causas de acción. Para sostener cada causa de acción, por lo tanto, habría que concluir que se alega un libelo *per se* en cada una de ellas de su propia faz ya que no se ha alegado hecho alguno adicional necesario para constituir el libelo excepto en cuanto a las imputaciones relacionadas con la Clínica del Doctor Seín, con respecto a las cuales se hacen alegaciones adicionales en el párrafo de la demanda titulado Alegaciones Comunes.

Únicamente estamos examinando la suficiencia de las alegaciones de la demanda ante un ataque preliminar. A estos efectos, se ha sostenido en forma general que en

casos de libelo no se debe declarar con lugar una moción de desestimación por dejar de exponer una reclamación, a menos que las palabras de la publicación interpretadas conjuntamente y considerando todas las alegaciones de la demanda, no sean razonablemente susceptibles de una interpretación difamatoria    Cfr. *Sullivan* v. *Republican Publishing Company*, supra; *Murphy* v. *Farmers Educational & Cooperative Union*, supra; *Roney* v. *Feinstein*, supra. Además, uno de los principios básicos del procedimiento civil moderno es interpretar las alegaciones en la forma que sea más favorable al que las formula.([6])    Así, se ha dicho que al resolver una moción para desestimar una demanda por dejar de exponer hechos que justifiquen la concesión de un remedio, el deber del tribunal no es determinar los méritos finales de la reclamación que se hace en la demanda.    Su deber más bien es considerar si, a la luz de la situación más favorable al demandante y resolviendo toda duda a favor de éste, la demanda expone una reclamación válida.    *Sierra* v. *Bird*, 78 D.P.R. 170 (1955); *Cruz* v. *Ortiz*, 74 D.P.R. 321 (1953); *Boulon* v. *Pérez*, 70 D.P.R. 988 (1950).

Analizadas las alegaciones de la demanda, llegamos a la conclusión que en las distintas causas de acción relacionadas se alegan hechos suficientes que constituyen prima facie causas de libelo *per se*, con excepción de la segunda, sexta, séptima, duodécima y decimotercera.    En estas cinco causas de acción, las publicaciones en que se basan no hacen referencia específica al recurrente ni tienden a desacreditarlo, deshonrarlo o menospreciarlo, o en otra forma afectarlo en los extremos que dispone la ley.

*Determinamos, por lo tanto, que no procedía que el tribunal de instancia declarase con lugar la moción de desestimación radicada por los recurridos excepto en cuanto a la segunda, sexta, séptima, duodécima y decimatercera causas*

---

(6) La Regla 6.6 de las Reglas de Procedimiento Civil de 1958 dice: "Todas las alegaciones se interpretarán con el propósito de hacer justicia."

*de acción alegadas en la demanda y, por lo tanto, no procedía que dictase sentencia declarando sin lugar la referida demanda en su totalidad. En tal virtud, debe confirmarse la sentencia en cuanto a las causas de acción segunda, sexta, séptima, duodécima y decimatercera; debe revocarse en cuanto a todas las demás causas de acción alegadas en la demanda en este caso; y por último, debe devolverse el caso para ulteriores procedimientos no inconsistentes con los términos de esta opinión.*

El Juez Presidente Señor Negrón Fernández no intervino.

